JACK D. SMITH v. FORD MOTOR COMPANY, THOMAS M. KEESEE, SR., JAMES K. DOBBS AND CLOVERDALE FORD, INC.

No. 67

(Filed 29 January 1976)

1. **Corporations § 25— contract made before incorporation — subsequent adoption of contract**

   Although a corporation may not technically ratify a contract made on its behalf prior to its incorporation, since it could not at that time have authorized such action on its behalf, it may, after it comes into existence, adopt such contract by its corporate action, which adoption may be express or implied, and thereby become liable for its performance.

2. **Master and Servant § 10— contract of employment — definite term not fixed — contract terminable at will**

   Where the contract of employment between plaintiff and defendant Cloverdale Ford, Inc. contained no provision whatever as to the duration of such employment, Cloverdale committed no breach of its contract when it terminated plaintiff's employment, even if there was no "just cause" for such termination, since a contract of employment which does not fix a definite term is terminable at the will of either party; therefore, plaintiff's complaint did not state a claim against Cloverdale upon which relief could be granted, and there was no error in dismissing the action as to Cloverdale.

3. **Master and Servant § 13— interference with employment contract — failure of complaint to state claim for relief**

   The trial court did not err in dismissing plaintiff's action for compensatory and punitive damages against individual defendants where plaintiff's complaint negated his contention that the motive of

Smith v. Ford Motor Co.

individual defendants in causing defendant Cloverdale Ford, Inc. to terminate the plaintiff's employment was to deprive plaintiff of any ownership interest in Cloverdale or any option to increase such ownership.

**4. Master and Servant § 13— employment contract terminable at will — interference by third person**

If A, knowing B is employed by C under a contract terminable at will by C, maliciously causes C to discharge B, which C would not otherwise have done, by threatening, otherwise, to terminate A's own contract with C, which contract is terminable at will by A, the sole motive for A's action being A's resentment of B's personal affiliation with an organization disapproved by A, which affiliation does not impair C's performance of its contract with A, B can maintain in the courts of this State an action against A for damages.

**5. Contracts § 32; Master and Servant § 13— contract of employment — outsider and non-outsider defined**

The term "outsider" appears to connote one who was not a party to the terminated contract and who had no legitimate business interest of his own in the subject matter thereof; conversely, one who is a non-outsider is one who, though not a party to the terminated contract, had a legitimate business interest of his own in the subject matter.

**6. Contracts § 32; Master and Servant § 13— non-outsider to contract — malicious procurement of termination — no immunity to suit**

A non-outsider to a contract is not immune to suit for the malicious procurement of the termination of a contract when such action has no relation whatever to that legitimate business interest which is the source of the defendant's non-outsider status, and in such case, the defendant is in the same position as an outsider; that is, the defendant's status as an outsider or a non-outsider is pertinent only to the question of justification for his action.

**7. Master and Servant § 13— interference with employment contract — exertion of economic pressure — qualified privilege**

To exert economic pressure upon an employer for the purpose of procuring the termination by him of his employment of another is a qualified privilege even though, as between the actor and employer, the actor has an absolute right to do that which produces such pressure upon the employer; and the actor is liable in damages to the employee for so procuring such termination of the employment if the actor so acted with malice and for a reason not reasonably related to the protection of a legitimate business interest of the actor.

**8. Master and Servant § 13— malicious interference with employment contract — sufficiency of complaint**

The complaint of the plaintiff which alleged the malicious interference by the defendant with the plaintiff's employment relation without justification stated a cause of action, and dismissal of the action was error.

Justice EXUM did not participate in the consideration or decision of this case.

Smith v. Ford Motor Co.

ON *certiorari* to the Court of Appeals, to review its decision, reported in 26 N.C. App. 181, 215 S.E. 2d 376, affirming the judgment of *Exum, J.,* at the 28 October 1974 Session of FORSYTH, dismissing the action for failure of the complaint to state a claim upon which relief can be granted.

The action is for compensatory and punitive damages, the complaint containing five alleged causes of action, the material allegations of these being summarized as follows:

*First Cause of Action:* Prior to 20 January 1971, Hull Dobbs Company operated a Ford dealership in Winston-Salem, the defendants Keesee and Dobbs being stockholders and directors of that company. Due to the poor performance of that dealership, Ford Motor Company (hereinafter called Ford) recommended a change of its name and the bringing in of a new general manager under an agreement allowing him to purchase 100 per cent of the stock of Hull Dobbs Company over a five-year period. The plaintiff then had a profitable position with a Ford dealership in Atlanta. He gave up that position, moved to Winston-Salem and took over the management of the said dealership in Winston-Salem, the name of which was changed to Cloverdale Ford. Due to the plaintiff's efforts and skill the dealership was immediately changed from a losing to a profitable operation and continued to be such throughout the plaintiff's management of it.

On 18 May 1971, the plaintiff, Keesee, Dobbs and one Davis entered into an agreement for the formation of a North Carolina corporation named Cloverdale Ford, Inc. (hereinafter called Cloverdale). The agreement provided that the plaintiff would be president and manager of Cloverdale at a monthly salary plus 15 per cent of the annual profits. The agreement further provided that the plaintiff and Davis would be the "operators" of the dealership and would own 40 per cent of the stock of Cloverdale. Pursuant to this agreement, the plaintiff purchased and received 19.5 per cent of the Cloverdale stock. The agreement further provided that after five years the holders of the remaining 60 per cent of the stock of Cloverdale would sell it to the corporation, thus making the plaintiff and Davis the sole owners of the outstanding shares of Cloverdale.

During 1972 and 1973, the plaintiff became active in an organization known as the Ford Dealer Alliance, an organization of Ford dealers formed for the purpose of protecting their

interests in transactions with Ford. Participation in this alliance by its dealers has been actively discouraged by Ford. When Ford discovered that the plaintiff was actively engaged in the alliance, Ford wrongfully exerted pressure on the stockholders of Cloverdale to cause the plaintiff to disassociate himself and Cloverdale from the alliance. In consequence of such pressure exerted by Ford, Dobbs demanded that the plaintiff discontinue his relationship with the alliance. The plaintiff agreed to disassociate Cloverdale from the alliance but refused to terminate his own support of the alliance.

When Ford learned of this, it "wrongfully, maliciously, and unlawfully exerted pressure" upon the stockholders and directors of Cloverdale to terminate the plaintiff's employment and his "ownership rights, present and prospective" in Cloverdale. As a direct and natural consequence of such actions by Ford, the directors of Cloverdale voted to terminate the plaintiff's employment as president and general manager of Cloverdale, which they would not have done but for the "wrongful, malicious and unlawful interference on the part of the defendant Ford." Thereby the plaintiff has been damaged through loss of his right to compensation from Cloverdale and his option to acquire full control of it at the end of the agreed five-year period.

*Second Cause of Action:* The acts and practices alleged in the first cause of action were in contravention of General Statutes 75-1.1 in that they were "unfair and deceptive and constitute a breach" of the ethical standards of dealings between Ford, its dealers and employees of such dealers. (This theory of recovery was abandoned by the plaintiff in the Court of Appeals.)

*Third Cause of Action:* Pursuant to the scheme of Ford maliciously to interfere with the plaintiff's contract, Keesee and Dobbs joined with and conspired with Ford wrongfully to terminate the plaintiff's employment as president and general manager of Cloverdale. Keesee and Dobbs wilfully and maliciously broke their contract with the plaintiff, doing so with the approval and "affirmative participation" of Ford. In furtherance of such common design, Keesee and Dobbs, after consultation with Ford, demanded that the plaintiff discontinue his activities on behalf of the Ford Dealer Alliance. Keesee, after consultations with representatives of Ford, demanded that the plaintiff resign his position and, upon his refusal to do so,

threatened him with the loss of "productive years in the car business." Keesee and Dobbs, after consultation with Ford, caused the directors of Cloverdale to meet and wrongfully to terminate the employment of the plaintiff as president and general manager of Cloverdale.

*Fourth Cause of Action:* As a result of the wrongful and malicious acts of Keesee and Dobbs, as alleged in the first three causes of action, the plaintiff's contract of employment was unlawfully broken to his damage.

*Fifth Cause of Action:* Cloverdale, after its incorporation, adopted and ratified the contract of 18 May 1971, hereinabove mentioned. Through the action of its directors on 24 April 1974, Cloverdale "wrongfully, wilfully and without just cause" terminated the plaintiff's contract of employment to his damage.

The contract of 18 May 1971, which was attached to the complaint as an exhibit and incorporated therein, provided, in summary:

The parties thereto were Keesee, Dobbs, Frank Goodwin (their associate), the plaintiff, Davis and Cloverdale (then a corporation to be formed). The parties agreed to form a corporation (Cloverdale) with a total paid in capital stock of $200,000, of which Keesee, Dobbs and Goodwin agreed to subscribe and pay for 60 per cent, the plaintiff and Davis 40 per cent. The plaintiff was to be employed as president and general manager of the corporation at a monthly salary plus 15 percent of the annual profits before taxes. Keesee, Dobbs and Goodwin granted to Cloverdale an option to purchase all of their stock of Cloverdale at book value 60 months after the corporation commenced business. The parties recognized an option in the plaintiff to purchase the stock of Davis in event of the death of Davis and agreed, in that event, to nominate the plaintiff as the "nominee successor" to the dealership, subject to the approval of Ford. The agreement further provided: "If [the plaintiff], in his position as President and General Manager of the Corporation, shall prove to be unsatisfactory in the opinion of [Keesee, Dobbs and Goodwin] *and* James W. Davis *or* the Ford Motor Company *from the standpoint of profits earned or the manner of operation of the corporation,* the employment of [the plaintiff] as President and Manager may be terminated by the Corporation. Upon such termination [the plaintiff] agrees to sell to James W. Davis the capital stock owned by him at book value of such

Smith v. Ford Motor Co.

stock at the end of the month preceding such termination and for cash." (Emphasis added.)

Keesee, Dobbs and Clovedale each filed a motion to dismiss the action because the complaint failed to state a claim against such defendant upon which relief can be granted.

Ford moved to dismiss the complaint on the same ground and also filed its answer denying each material allegation of the complaint and alleging by way of further answers and defenses the plaintiff proved "unsatisfactory as President and General Manager" and, consequently, there was an absolute right under the contract upon which the plaintiff relies to terminate his employment as president and general manager; at the time the plaintiff's such employment was terminated by Cloverdale, there was in existence a written franchise agreement between Ford and Cloverdale, a copy of which is attached to the answer as an exhibit and incorporated therein, which franchise agreement reserved to Ford the right to cease to do business with any dealer "who is not contributing sufficiently" to the success of Ford, and which franchise agreement provided it should "continue in force and effect from the date of its execution until terminated by either party under the provisions of Paragraph 17 hereof." (The said Paragraph 17 is set forth below.) Ford had a direct and valid business interest in the successful operation of Cloverdale and the absolute contractual right to terminate the franchise agreement between it and Cloverdale in the event that the operation did not meet the requirements of the franchise agreement. Ford's exercise of such contractual rights, or its suggestion that it might become necessary for it to do so, was valid and proper and did not give rise to any of the plaintiff's alleged causes of action.

For the purpose of the hearing of the motions to dismiss, the plaintiff admitted, in response to Ford's request for such admission, that the franchise agreement attached to Ford's answer was a true copy of the agreement between Ford and Cloverdale and that it was signed by the plaintiff as president of Cloverdale. The pertinent portions of that agreement, covering 72 pages of the printed record, are:

"The Company [Ford] * * * solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

"Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success.

"The Company and the Dealer * * * also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale. * * *

"The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). * * *

"This agreement shall continue in force and effect from the date of its execution until terminated by either party under the provisions of paragraph 17 hereof. * * *

"The dealer's performance of his sales responsibility for CARS shall be measured by such reasonable criteria as the Company may develop from time to time, including: * * *

"The Dealer's performance of his sales responsibility for GENUINE PARTS shall be measured by such reasonable criteria as the Company may develop from time to time including: * * *

"The Dealer shall employ and train such numbers and classifications of competent personnel of good character, including, without limitation, sales, parts, services, owner relations and other department managers, salesmen and service technicians, as will enable the Dealer to fulfill all his responsibilities under this agreement. * * *

"Effective operation of the Dealer's business is dependent in large part on the Dealer's management becoming a part of and accepted within his local community accordingly, each person named in subparagraph F(ii) [Smith and Davis] hereof shall * * * reside within the DEALER'S LOCALITY. * * *

"TERMINATION OR NONRENEWAL OF AGREEMENT

"17.(a) BY DEALER. The Dealer may terminate or not renew this agreement at any time at will by giving the Company at least thirty (30) days prior written notice thereof.

"17.(b) BY COMPANY DUE TO EVENTS CONTROLLED BY DEALER. The following represent events which are substantially within the control of the Dealer and over which the Company has no control, and which are so contrary to the intent and purpose of this agreement as to warrant its termination or nonrenewal:

"(1) Any transfer * * * by the Dealer of any interest in * * * this agreement; * * * or any change * * * without the Company's prior written consent, * * * in the * * * operating management of the Dealer * * * .

"(2) Any misrepresentation in applying for this agreement * * * .

"(3) Insolvency of the Dealer * * * .

"(4) Conviction * * * of the Dealer or any person named in paragraph F [the plaintiff or Davis] for any violation of law, or any conduct by any such person unbecoming a reputable businessman, *or* disagreement between or among any persons named in paragraph F, which in the Company's opinion tends to affect adversely the operation or business of the Dealer * * * the Company, or COMPANY PRODUCTS.

"(5) The Dealer shall have engaged, after written warning by the Company, in any advertising or business practice contrary to the provisions * * * of this agreement.

"(6) Failure of the Dealer to fulfill any provision [of certain paragraphs] or to pay the Company any sum due pursuant to any agreement * * * .

"Upon occurrence of any of the foregoing events, the Company may terminate this agreement by giving the Dealer at least fifteen (15) days prior written notice thereof.

"17.(c) BY COMPANY FOR NONPERFORMANCE BY DEALER OF SALES, SERVICE, FACILITIES OR OTHER RESPONSIBILITIES.

* * * [T]he Company shall notify the Dealer in writing of such failure * * * . If the Dealer fails or refuses to cure the same within a reasonable time after such notice, the Company may terminate or not renew this agreement by giving the Dealer at least ninety (90) days prior written notice thereof. * * *

"17. (d) BY COMPANY OR DEALER BECAUSE OF DEATH OR PHYSICAL OR MENTAL INCAPACITY OF ANY PRINCIPAL OWNER. * * *

"17. (e) BY COMPANY OR DEALER FOR FAILURE OF DEALER OR COMPANY TO BE LICENSED. * * *

"17. (f) BY COMPANY AT WILL. If this agreement is not for a stated term specified in paragraph G of this agreement [There was no such stated term specified.] the Company may terminate this agreement at will at any time by giving the Dealer at least one hundred and twenty (120) days prior written notice thereof. * * *

"17. (h) ACTS IN GOOD FAITH.

"(1) The Dealer acknowledges that each of his responsibilities under this agreement is reasonable, proper and fundamental to the purpose of this agreement and that (i) his failure to fulfill any of them would constitute a material breach of this agreement * * *. The Dealer acknowledges that any such failure, occurrence or event constitutes a reasonable, fair, good, due and just cause and provocation for termination or nonrenewal of this agreement by the Company.

"(2) The Dealer agrees that if the Company * * * gives the Dealer notice of termination or nonrenewal * * * because of any such failure, occurrence or event, then such request, advice, notice, termination or nonrenewal shall not be considered to constitute or be evidence of coercion or intimidation, or threat thereof, or to be unreasonable, unfair, undue or unjust, or to be not in good faith."

Nothing in the record or the briefs of the parties suggests any failure by Cloverdale, while the plaintiff served as its president and general manager, to perform in full all of its obligations under the franchise agreement, or that Cloverdale, under the plaintiff's management, was not a successful dealer operation, or that the plaintiff failed in the proper performance of any of

his duties or was in any way unsatisfactory to Cloverdale or unsatisfactory to Ford except in his announced intention to continue his personal affiliation with and activity in the Ford Dealer Alliance, of which organization Ford disapproved. Nothing in the record indicates the nature of the plaintiff's activities in the Ford Dealer Alliance.

*Hatfield and Allman by Weston P. Hatfield and R. Bradford Leggett for plaintiff.*

*Hudson, Petree, Stockton, Stockton & Robinson by J. Robert Elster and W. Thompson Comerford, Jr. for defendant Ford Motor Company.*

*Womble, Carlyle, Sandridge & Rice by W. P. Sandridge, Jr., for defendants Cloverdale Ford, Inc., Thomas Keesee, Sr., and James K. Dobbs.*

LAKE, Justice.

[1]  The complaint alleges that, after its incorporation, Cloverdale adopted the contract of 18 May 1971 concerning the plaintiff's employment as its president and general manager. Although a corporation may not technically ratify a contract made on its behalf prior to its incorporation, since it could not at that time have authorized such action on its behalf, it may, after it comes into existence, adopt such contract by its corporate action, which adoption may be express or implied, and thereby become liable for its performance. *McCrillis v. A & W Enterprises, Inc.,* 270 N.C. 637, 155 S.E. 2d 281 (1967) ; Robinson, N. C. Corporation Law (2d ed. 1974) §§ 2-4.

[2]  Thus, under the allegations of the complaint which, for the purpose of this appeal must be deemed true, Cloverdale became liable as a party to the contract. However, the contract of employment upon which the plaintiff relies, which was made by him a part of his complaint, contains no provision whatever as to the duration of such employment. "Where a contract of employment does not fix a definite term, it is terminable at the will of either party, with or without cause, except in those instances in which the employee is protected from discharge by statute." *Still v. Lance,* 279 N.C. 254, 182 S.E. 2d 403; Strong, N. C. Index 2d, Master and Servant, § 10. There is no such statutory protection applicable to the plaintiff in this case. Consequently, Cloverdale committed no breach of its contract when it terminated the plaintiff's employment even if, as the plaintiff

alleges, there was no "just cause" for such termination. The complaint, therefore, does not state a claim against Cloverdale upon which relief can be granted and there was no error in dismissing the action as to Cloverdale.

As to the defendants Keesee and Dobbs, it is alleged in the complaint that these defendants "joined with and conspired with the defendant Ford Motor Company, to wrongfully terminate the employment of the plaintiff"; that after the plaintiff had converted the dealership into a profitable one, these defendants, realizing that the option granted by the agreement of 18 May 1971 for the purchase of their stock in Cloverdale for its book value would result in a great loss to them, wilfully, wrongfully and maliciously broke their said contract with the plaintiff; that they caused a letter to be written to the plaintiff demanding that he discontinue his activities on behalf of the Ford Dealer Alliance; that they caused a meeting of the board of directors of Cloverdale to be called and thereat they caused a vote to be taken which "wrongfully and unlawfully terminated the employment of the plaintiff."

In his petition to this Court for certiorari and in his brief, the plaintiff contends, "It was clearly alleged in the Complaint that the sole inducement for the termination of [the plaintiff's] employment was to sever his ownership rights in [Cloverdale]." He further states that the termination of the plaintiff's employment by the Board of Directors of Cloverdale "was motivated and consummated for the reason that the defendants Dobbs and Keesee, after seeing how successful this particular dealership was, did not want to be placed in a position wherein they would have to sell their stock at book value, but rather, wanted to create a situation wherein their own ownership rights would be enhanced." Again, the plaintiff asserts that his "stock rights were interlocked with his continuing employment."

A fatal difficulty with the plaintiff's contentions concerning his action against the defendants Keesee and Dobbs is that they are contrary to the provisions of the contract of 18 May 1971, which the plaintiff attached to and made part of his complaint. As noted above, the action of Cloverdale in terminating the plaintiff's employment by it was not a breach of that contract. Furthermore, the termination of his employment by Cloverdale did not terminate any right of the plaintiff to acquire stock in Cloverdale owned by Keesee and Dobbs. The

provision of the contract on which the plaintiff bases his contention in this respect reads:

> "Sixty (60) months after the commencement of business by the corporation, [Keesee, Dobbs and Goodwin] grants an option *to said corporation* [i.e., Cloverdale] to purchase not less than all of the capital stock owned by [Keesee, Davis and Goodwin] at book value for cash, such book value to be determined according to the method outlined in Section 3(b) above. The exercise of this option *by the corporation* shall be evidenced in writing delivered to [Keesee, Davis and Goodwin] at its principal office in Memphis, Tennessee." (Emphasis added.)

This provision of the contract of 18 May 1971 is not a contract of sale but a grant of an option to purchase. The option is not granted to the plaintiff but to Cloverdale. At no time did the plaintiff have a controlling stock interest in Cloverdale or control of its board of directors. On the contrary, the complaint makes it clear that control of Cloverdale was at all times in Keesee, Dobbs and Goodwin. If they did not wish a transfer of their stock to Cloverdale at book value to occur, they could prevent such transfer by the exercise of their control over Cloverdale whether or not the plaintiff remained in its employ. Furthermore, such option is not contingent upon the plaintiff's employment by Cloverdale but upon the mere passage of 60 months from the commencement of business by Cloverdale. The option remains in effect notwithstanding the plaintiff's discharge.

Under the caption "UNSATISFACTORY MANAGEMENT," the contract of 18 May 1971, which the plaintiff made part of the complaint, provides:

> "The parties hereto agree that if [the plaintiff], in his position as President and General Manager of the Corporation [i.e., Cloverdale], shall prove to be unsatisfactory in the opinion of [Keesee, Dobbs and Goodwin] *and* James W. Davis, *or* the Ford Motor Company *from the standpoint of profits earned or the manner of operation of the Corporation,* the employment of [the plaintiff] as President and Manager may be terminated by the Corporation. *Upon such termination* [the plaintiff] agrees to sell to James W. Davis the capital stock owned by him at book value of such stock at the end of the month preceding such termination and for cash." (Emphasis added.)

It will be observed that the provision in the contract for the sale of the plaintiff's stock to Davis is contingent upon "such termination," i.e., a termination for the reason that the plaintiff proved to be "unsatisfactory" to a combination of Keesee, Dobbs, Goodwin and Davis, or to Ford "from the standpoint of profits earned or the manner of operation of the Corporation." It does not appear that this was the reason for the termination of the plaintiff's employment by Cloverdale. On the contrary, the complaint alleges that this was not the cause of such termination.

[3]  Thus, the complaint negates the plaintiff's contention that the motive of Keesee and Dobbs in causing Cloverdale to terminate the plaintiff's employment was to deprive the plaintiff of any ownership interest in Cloverdale or any option to increase such ownership interest. Accordingly, we find no error in the judgment of the Superior Court dismissing the action as to the defendants Keesee and Dobbs.

As to Ford the substance of the complaint is: (1) Ford knew the plaintiff had a contract with Cloverdale, a Ford dealer, for employment by it, terminable at the will of Cloverdale; (2) the plaintiff was performing well his duties under that contract and, as a result, Cloverdale was prospering and was a successful dealer in Ford products; (3) but for the "wrongful, malicious and unlawful interference" by Ford therewith, this employment would have been continued by Cloverdale; (4) Ford "wrongfully, maliciously, and unlawfully exerted pressure" upon Cloverdale to terminate the plaintiff's employment; (5) the sole reason for Ford's interference with the employment relation between the plaintiff and Cloverdale was the plaintiff's refusal to discontinue his personal participation in the Ford Dealer Alliance, "a group of Ford dealers who had gathered together for the purpose of protecting their own interest in transactions with the defendant Ford Motor Company"; (6) due to pressure so exerted upon it by Ford, Cloverdale terminated the plaintiff's employment; and (7) thereby, the plaintiff was damaged.

Ford, by its motion to dismiss, says that, even though this be true, the courts of this State cannot give the plaintiff any relief against Ford. The Superior Court and the Court of Appeals so held. We reach a different conclusion.

For the purpose of the motion by Ford to dismiss, we treat the allegations of the complaint as true. *Sutton v. Duke,*

277 N.C. 94, 176 S.E. 2d 161 (1970). We also take into account the provisons of Ford's Franchise Agreement with Cloverdale. Rule 12(b) G.S. 1A-1. Assuming that, pursuant to Rule 12(b), the Superior Court considered Ford's motion to dismiss as a motion for summary judgment, which does not appear from the record, there is nothing in the record to indicate that the parties were given reasonable opportunity to present all material pertinent to such a motion as Rule 12(b) requires. Furthermore, the pleadings present genuine and material issues of fact between the plaintiff and Ford so summary judgment could not properly have been entered on the ground of the absence of such issues. These are for determination by a jury, assuming evidence be offered in support of the plaintiff's allegations. *Sutton v. Duke, supra.*

[4] The question presented to us by this appeal is: If A, knowing B is employed by C under a contract terminable at will by C, maliciously causes C to discharge B, which C would not otherwise have done, by threatening, otherwise, to terminate A's own contract with C, which contract is terminable at will by A, the sole motive for A's action being A's resentment of B's personal affiliation with an organization disapproved by A, which affiliation does not impair C's performance of its contract with A, can B maintain in the courts of this State an action against A for damages? Our conclusion is that he can.

In *Childress v. Abeles,* 240 N.C. 667, 84 S.E. 2d 176 (1954), Justice Parker, later Chief Justice, speaking for this Court, said:

"[T]he overwhelming weight of authority in this nation is that an action in tort lies against an outsider who knowingly, intentionally and unjustifiably induces one party to a contract to breach it to the damage of the other party.

"To subject the outsider to liability for compensatory damages on account of this tort, the plaintiff must allege and prove these essential elements of the wrong: *First,* that a valid contract existed between the plaintiff and a third person, conferring upon the plaintiff some contractual right against the third person. *Second,* that the outsider had knowledge of the plaintiff's contract with the third person. *Third,* that the outsider intentionally induced the third person not to perform his contract with the plain-

tiff. *Fourth,* that in so doing the outsider acted without justification. *Fifth,* that the outsider's act caused the plaintiff actual damages." (Citations omitted.)

As we have noted above, there was no breach by Cloverdale of its contract with the plaintiff, but an exercise by Cloverdale of its legal right to terminate that contract. This circumstance does not, however, defeat the plaintiff's right of action against Ford. *Childress v. Abeles, supra,* expressly so states. The wrong for which the courts may give redress includes also the procurement of the termination of a contract which otherwise would have continued in effect. *Truax v. Raich,* 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915); *United States Fidelity & Guaranty Co. v. Millonas,* 206 Ala. 147, 89 So. 732 (1921); *London Guarantee & Accident Co. v. Horn,* 206 Ill. 493, 69 N.E. 526 (1903); 45 AM. JUR. 2d, Interference, § 24; Annot., 84 ALR 43, 60. As Mr. Justice Hughes, later Chief Justice, said in *Truax v. Raich, supra,* "The fact that the employment is at the will of the parties, respectively, does not make it one at the will of others."

The fact that the plaintiff's contract with Cloverdale contained an express provision that Cloverdale might terminate the plaintiff's employment if the plaintiff "shall prove to be unsatisfactory in the opinion of * * * the Ford Motor Company from the standpoint of profits earned or the manner of operation of the corporation," is not the basis of a defense to Ford in the present action. On the contrary, it clearly indicates that dissatisfaction for the stated reasons was intended by the parties to be the *only* justification for Ford's expressing to Cloverdale its displeasure over the continuation of the plaintiff's employment. This provision did not enlarge Cloverdale's right to terminate the employment for, as we have seen, it was terminable by Cloverdale at will. While Ford was not a party to the contract of 18 May 1971, wherein this provision appears, it is obvious that Ford knew of the contract and of this provision in it. Nowhere in the record is it suggested that Ford was, or had any basis whatever for being, dissatisfied with the plaintiff's performance as president and general manager of Cloverdale "from the standpoint of profits earned or the manner of operation of" Cloverdale. The complaint clearly alleges that Ford brought about the plaintiff's discharge because, and solely because, the plaintiff, in his personal capacity, belonged to the Ford Dealer Alliance and refused to withdraw therefrom.

In *Kelly v. Harvester Co.*, 278 N.C. 153, 179 S.E. 2d 396 (1971), this Court affirmed a directed verdict in favor of the defendant in an action for wrongful and malicious interference with the plaintiff's contract of employment. There, as here, the employer was a dealer in the defendant's products under a franchise agreement which the defendant threatened to terminate if the plaintiff were not discharged. For that reason only, according to the plaintiff's evidence, the plaintiff was discharged. The franchise agreement between the defendant and the employer provided that the defendant could terminate the agreement immediately if the dealer were a corporation, which it was, and if there were a change in its management, which the plaintiff's employment was. The plaintiff's predecessor as manager of the dealer was satisfactory to the defendant. The defendant's primary objection to the plaintiff as the dealer's manager was its fear that the plaintiff, who had previously been located in High Point, would draw so much business from High Point that he would jeopardize the ability of the defendant's dealer in that city to continue in successful operation. After observing that the defendant was not "an outsider," this Court said:

> "Absent *special circumstances,* neither the exercise nor the threat to exercise a legal right may be considered tortious conduct.
>
> " 'Absolute rights, including primarily rights incident to the ownership of property, *rights growing out of contractual relations,* and the right to enter or refuse to enter into contractual relations, may be exercised without liability for interference without reference to one's motive as to any injury directly resulting therefrom. * * * In other words, acts performed with such an intent or purpose as to constitute legal malice and without justification, which otherwise would amount to a wrongful interference with business relations, are not tortious where committed in the exercise of an absolute right.' 45 AM. JUR. 2d Interference, § 23. * * *
>
> "We think the evidence as to *special circumstances,* when considered in the light most favorable to plaintiff, is sufficient to impair the Harvester Company's legal right (option) to terminate (or threaten to terminate) the franchise agreement when there is 'a substantial change in the operation, management or control of the dealership.''

Smith v. Ford Motor Co.

It is apparent that in *Kelly v. Harvester Co., supra,* the purpose or motive of the defendant in bringing about the termination of the plaintiff's employment by its dealer was not a malicious desire to injure the plaintiff by reason of his conduct or affliations separate and apart from the operation of the dealership in which he was employed, but was to protect the operation of the defendant's other dealer in High Point, in whose successful operation the defendant had a legitimate and substantial business interest. In the present case, according to the allegations of the complaint, the defendant's purpose and motive was malicious, it being to punish the plaintiff for his refusal to terminate his personal affiliation with the Ford Dealer Alliance. It does not appear, upon the present record, that such affiliation by the plaintiff with the Ford Dealer Alliance would, in any way, jeopardize the successful operation of Cloverdale or of any other Ford dealer or any legitimate business interest of Ford.

[5] The term "outsider" used in these two North Carolina decisions has not been defined by this Court and appears to be peculiar to this jurisdiction. It appears to connote one who was not a party to the terminated contract and who had no legitimate business interest of his own in the subject matter thereof. Conversely, one who is a non-outsider is one who, though not a party to the terminated contract, had a legitimate business interest of his own in the subject matter. Obviously, Ford has a legitimate business interest in the success of Cloverdale, its dealer. The parties to the plaintiff's employment contract recognized this by providing therein that the employment might be terminated by Cloverdale if Ford found the plaintiff to be unsatisfactory "from the standpoint of profits earned or the manner of operation of" Cloverdale.

[6] *Kelly v. Harvester Co., supra,* sustained the right of such a non-outsider to insist upon the discharge of an employee whose continued employment jeopardized its legitimate business interest in the subject matter of the terminated contract. To extend that decision to the present case would confer upon the non-outsider the right to apply economic pressure upon the party to the contract in order to bring about a termination of it for a reason unrelated to that legitimate business interest which is the source of the defendant's non-outsider status. We perceive no reason for conferring upon the non-outsider immunity to suit for the malicious procurement of the termination of a con-

tract when such action has no relation whatever to the source of the non-outsider status. In such case, the defendant is in the same position as an outsider. That is, the defendant's status as an outsider or a non-outsider is pertinent only to the question or justification for his action.

In *Wilson v. McClenny*, 262 N.C. 121, 136 S.E. 2d 569 (1964), the plaintiff having been dismissed as president of a corporation, brought an action against four of its directors for alleged tortious interference by them with the contractual relationship between him and the corporation. In affirming a judgment of nonsuit as to that cause of action this Court, speaking through Justice Sharp, now Chief Justice, said:

> "The distinction between *Childress* [*supra*] and the case *sub judice* is that the defendants here are not *outsiders*. They are all stockholders and directors of [the corporate employer]. As stockholders they had a financial interest in the corporation; as directors they owed it fidelity and the duty to use due care in the management of its business. G.S. § 55-35. As either directors or stockholders, they were privileged purposely to cause the corporation not to renew plaintiff's contract as president if, in securing this action, they did not employ any improper means and if they acted in good faith to protect the interests of the corporation. In other words, because of their financial interest and fiduciary relationship they had a qualified privilege to interfere with contractual relations between the corporation and a third party."

To hold, as was done in *Wilson v. McClenny, supra,* that a non-outsider has a *qualified* right to bring about the termination of another's terminable contract of employment when, in good faith, he believes this to be necessary to protect his own legitimate business interest or to perform his own fiduciary duty to the employer, is a far different thing from holding that a non-outsider is *ipso facto* immune to suit for damages for bringing about the termination of such contract in all cases.

Ford contends that it did nothing to cause the termination of the plaintiff's contract with Cloverdale, except to threaten to terminate its own franchise agreement with Cloverdale if the plaintiff were not discharged, and that its contract with Cloverdale was expressly terminable at will by Ford upon the giving of proper notice. Consequently, Ford says, the complaint

charges Ford with doing nothing except that which Ford had a right to do and its exercise of its own lawful right to terminate its contract with Cloverdale cannot be a tort against the plaintiff.

In 45 AM. JUR. 2d, Interference, § 23, it is said:

"Absolute rights, including primarily rights incident to the ownership of property, rights growing out of contractual relations, and the right to enter or refuse to enter into contractual relations, may be exercised without liability for interference without reference to one's motive as to any injury directly resulting therefrom. This is in contrast to the exercise of common and qualified rights which may be exercised only where there is justification therefor. In other words, acts performed with such an intent or purpose as to constitute legal malice and without justification, which otherwise would amount to a wrongful interference with business relations, are not tortious where committed in the exercise of an absolute right. * * *

"Enforcing or complying with one's own valid contract does not constitute unjustifiable interference with another's contract, nor does the exercise of a legal right to terminate an agreement by a contracting party. An action taken to protect one's contractual right is also ordinarily justification for interference with another's contract. * * *

"There is no liability for inducing the discharge of an employee by the exercise of a contractual right, which, carried into execution, results in the loss of the plaintiff's employment, since the loss of employment is due to the exercise of a legal right, absolute in character, and the motive for the exercise of such right is not a matter open to inquiry."

Of course, had Ford, for a reason not related to the plaintiff, terminated its franchise agreement with Cloverdale, which it had the right to do at will upon giving the specified notice, it would thereby have incurred no liability to Cloverdale or to the plaintiff or other employees, customers or suppliers of Cloverdale who, in consequence of such termination, lost their own employment or business opportunities. In such case, the plaintiff's loss of employment would have been merely the indirect, consequential result of Ford's exercise of its right, absolute as between it and Cloverdale, to terminate its contract. It

Smith v. Ford Motor Co.

is equally obvious that one, such as a customer or potential customer of Cloverdale, may refuse to patronize or discontinue his patronage of a business establishment because of his dissatisfaction, whether warranted or not, with services rendered by an employee of the establishment and may, in good faith, inform the employer of his reason for so doing. If the employer, in an effort to retain the patronage of such dissatisfied customer, discharge such employee, the latter would have no right of action for damages against such customer since his loss of employment would be merely the indirect, consequential result of the customer's exercise of his own right.

We are not inadvertent to decisions in other jurisdictions to the effect that one may, without liability, bring about the discharge of an employee, because of personal differences with the employee about matters unrelated to the business of the employer, by threatening to terminate his own terminable contract with the employer unless the employee is discharged. The leading case so holding is *Raycroft v. Tayntor*, 68 Vt. 219, 35 A. 53 (1896). See also: *Bliss v. Southern Pacific Co.*, 212 Ore. 634, 321 P. 2d 324 (1958). We believe, however, that those cases are not in accord with the greater weight of more recent authority.

Section 766 of the Restatement of Torts (1939) states:

"Except as stated in Section 698 [not applicable here], one who, without a privilege to do so, induces or otherwise purposely causes a third person not to

(a) perform a contract with another, or

(b) enter into or continue a business relation with another is liable to the other for the harm caused thereby."

Comment g upon this section of the Restatement reads:

*"Inducement by Refusal to Deal.* A refusal to deal is one means by which a person may induce another to commit a breach of his contract with a third person or to refrain from entering into or continuing a business relation with him. Thus A may induce B to cease dealing with C by threatening not to enter into, or to sever, business relations with B, unless B does so cease. Such a situation frequently presents a nice question of fact. While, under the rule stated in this Section, A may not, without a privilege,

induce B not to deal with C, A is ordinarily free, as stated in § 762, to refuse to deal with B for any reason or no reason. The difficult question of fact presented in this situation is, then, whether A is merely exercising his freedom to select the persons with whom he will do business or is inducing B not to deal with C. * * * If he is merely exercising that freedom, he is not liable to C for the harm caused by B's choice not to lose A's business for the sake of getting C's."

Comment m upon this section of the Restatement reads:

"If the actor does not act for the purpose of advancing the interest for the protection of which the privilege is given, he is not exercising the privilege and is not protected by it. No privilege is given to protect merely the interest in satisfying one's spite or ill will."

Professor Carpenter, writing in 41 Harv. L. Rev. 728, 746 (1928), under the title "Interference With Contract Relations," says:

"The privilege [to interfere] is conditional or qualified; that is, it is lost if exercised for a wrong purpose. In general, a wrong purpose exists where the act is done other than as a reasonable and *bona fide* attempt to protect the interest of the defendant which is involved."

In Oakes, Organized Labor and Industrial Conflicts, § 500 (1927), it is said:

"Because one may refrain from entering into a contract with another, or may exercise a right under a contract with another, without incurring any liability to such other, irrespective of his motive in the matter, he has been said to have an absolute right to do so. This has led some courts to hold that such right is likewise absolute as to third parties. But it does not follow that because he may have an absolute right to refrain from contracting with another, or to exercise a right growing out of a contract with such other, that it is not a qualified right as to third persons injuriously affected thereby."

In *McMaster v. Ford Motor Co.*, 122 S.C. 244, 115 S.E. 244 (1923), it was held there was no liability upon the defendant for ordering its dealers to refuse to install on Ford automobiles

a device manufactured by the plaintiff which would make the automobiles of a wider gauge, or for its conditioning its warranty of Ford automobiles so as to negate such warranty if the plaintiff's device be used thereon. As the Court said, the Ford Motor Company has the right to put its cars on the market in such form and with such parts and attachments as it sees fit and to prevent any alteration or modification thereof so long as it retained any legal interest in the automobiles. In so doing, Ford was clearly acting to protect its good will and its interest in its own product.

In *United States Fidelity and Guaranty Co. v. Millonas, supra,* an insurance company issued to an employer a liability policy which gave the company the unqualified right to cancel it. An injured employee presented a claim for damages against the employer for which the insurance company would be responsible under its policy. To compel the employee to accept a settlement offered by the insurance company, it informed the employer, the policyholder, that it would cancel the policy unless the employee were discharged. He was so discharged and sued the insurance company for damages. In affirming a judgment for the plaintiff, the Alabama Court said:

> "In the instant case, the right of the defendant to cancel the contract of insurance with plaintiff's employer was of course not questioned, and if his discharge had been but the result or consequence of such an exercise of a lawful right, no cause of action would be shown. Such, however, was not the case, as evidence for the plaintiff tends to show that his discharge was procured maliciously and wrongfully by a threat of cancellation, for the purpose of forcing a settlement of his claim favorable to the company and disadvantageous to himself."

In *London Guarantee & Accident Co. v. Horn, supra,* in a similar situation, the Illinois Court said:

> "[C]ertainly a desire to compel the employee to surrender a cause of action *wholly disconnected with the continuance of his employment* does not afford justification for interference by a third party, who desires the satisfaction of the alleged liability. * * *
>
> "[The employer] had the undoubted right to discharge Horn whenever it desired. It could discharge him for reasons the most whimsical or malicious, or for no

reason at all, and no cause of action in his favor would be thereby created; but it by no means follows that while the relations between [the employer] and Horn were pleasant, and while, as the evidence shows, it was the expectation of the company that Horn would continue in its employ 'all the year around,' that the interference of appellant, whereby it secured the employer to exercise a right which was given it by the law, but which, except for the action of appellant, it would not have exercised, is not actionable. * * *

"We therefore conclude, both upon reason and authority, that where a third party induces an employer to discharge his employee who is working under a contract terminable at will, but under which the employment would have continued indefinitely, in accordance with the desire of the employer, except for such interference, and where the only motive moving the third party is a desire to injure the employee and to benefit himself at the expense of the employee by compelling the latter to surrender an alleged cause of action, for the satisfaction of which, in whole or in part, such third party is liable, and where such right of action does not depend upon and is not connected with the continuance of such employment, a cause of action arises in favor of the employee against the third party." (Emphasis added.)

In *Huskie v. Griffin*, 75 N.H. 345, 74 A. 595 (1909), the Court said:

"It has been said, however, in several cases, that a wrongful motive cannot convert a legal act into an illegal one, and many judges have thought this was the end of the law upon the question. They seem to proceed upon a theory of absolute right in the defendant, which is at variance with the holding in many of the same cases that the defendant may be called upon to justify his conduct. Indeed, the authorities are practically unanimous to the effect that the defendant is liable unless he shows a justification. If this is true, it follows as a matter of course that his right is not absolute. It is a qualified one, and the rightfulness of its exercise depends upon all those elements which go to make up a cause for human action. The reasonableness of the act cannot always be satisfactorily determined until something is known of the state of the actor's mind. The

'justification may be found sometimes in the circumstances under which it is done, irrespective of motive, sometimes in the motive alone, and sometimes in the circumstances and motive combined.' * * *

"Since the defendant is called upon to justify—to show reasonable. cause for the interference with his neighbor's right—it seems to clearly follow that, where his only reason is his malicious wish to injury the plaintiff, he, has no justification."

In *Johnson v. Aetna Life Insurance Co.,* 158 Wis. 56, 147 N.W. 32 (1914), the plaintiff alleged that the defendant insurance company induced his employer to discharge him so that he would not be able to earn money with which to prosecute a suit against the employer and the insurance company for injuries, threatening to cancel the employer's insurance if the employer did not so discharge the plaintiff. The Court held the evidence was insufficient to take the case to the jury but said, "This savors too strongly of oppression to be considered a legitimate reason for a third party interfering with the relations between employer and employee."

Also sustaining the right of the discharged employee to sue the interferer, who brought about his discharge by threat to terminate or refuse to enter into contractual relations with the employer are *Hill Grocery Co. v. Carroll,* 223 Ala. 376, 136 So. 789 (1931), and *Pino v. Transatlantic Marine, Inc.,* 358 Mass. 498, 265 N.E. 2d 583 (1970).

[7] We hold: To exert economic pressure upon an employer for the purpose of procuring the termination by him of his employment of another is a qualified privilege even though, as between the actor and the employer, the actor has an absolute right to do that which produces such pressure upon the employer. The actor is liable in damages to the employee for so procuring such termination of the employment if the actor so acted with malice and for a reason not reasonably related to the protection of a legitimate business interest of the actor. If the reason for such action be the employee's personal participation in an association not approved by the actor, the burden is upon the actor, when sued for damages for so procuring the termination of the employment relation to show that the participation by the employee in such association afforded reasonable basis for the belief that a legitimate business interest of the actor would thereby be damaged or imperiled.

[8] The complaint of the plaintiff in this action alleges the malicious interference by the defendant with the plaintiff's employment relation without such justification. Consequently, it states a cause of action within the rule of *Childress v. Abeles, supra,* and the dismissal of the action as against the Ford Motor Company was error. The matter is, therefore, remanded to the Court of Appeals for the entry by it of a judgment further remanding it to the Superior Court for trial of the plaintiff's alleged cause of action against Ford.,

As to the defendant Cloverdale Ford, Inc., affirmed.

As to the defendants Keesee and Dobbs, affirmed.

As to the defendant Ford Motor company, reversed and remanded.

Justice EXUM did not participate in the consideration or decision of this case.