**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-1786**

B. VITTAL SHENOY,

Plaintiff – Appellant,

v.

CHARLOTTE-MECKLENBURG HOSPITAL AUTHORITY, d/b/a Carolinas HealthCare System; MERCY HEALTH SERVICES, INCORPORATED; MERCY HOSPITAL, INCORPORATED; CAROLINAS PATHOLOGY GROUP, PA,

Defendants – Appellees,

and

JAMES E.S. HYNES; MICHAEL C. TARWATER; PAUL S. FRANZ; C. CURTIS COPENHAVER; WILLIAM K. BROWN; DENNIS J. PHILLIPS; EDWARD H. LIPFORD, M.D.; MARIE-CLAIRE C. MARROUM, M.D.; FILMON M. SEXTON, M.D.; SANFORD P. BENJAMIN, M.D.; THE CHS BOARD OF COMMISSIONERS; PATHOLOGY ASSOCIATES SERVICES, INCORPORATED,

Defendants.

------------------------------

ASSOCIATION OF AMERICAN PHYSICIANS AND SURGEONS, INCORPORATED,

Amicus Supporting Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Graham C. Mullen, Senior District Judge. (3:08-cv-00125-GCM-DCK)

Argued: March 22, 2013                    Decided: May 13, 2013

Before SHEDD and FLOYD, Circuit Judges, and Joseph R. GOODWIN, United States District Judge for the Southern District of West Virginia, sitting by designation.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED**: Mark Jay Prak, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, Raleigh, North Carolina, for Appellant. Charles Evans Johnson, ROBINSON, BRADSHAW & HINSON, PA, Charlotte, North Carolina; William H. Sturges, SHUMAKER LOOP & KENDRICK, LLP, Charlotte, North Carolina, for Appellees. **ON BRIEF**: Julia C. Ambrose, Eric M. David, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P., Raleigh, North Carolina, for Appellant. Susan Miller Huber, ROBINSON, BRADSHAW & HINSON, PA, Charlotte, North Carolina, for Appellees Charlotte-Mecklenburg Hospital Authority, d/b/a Carolinas HealthCare System, Mercy Health Services, Incorporated, and Mercy Hospital, Incorporated. Frederick M. Thurman, Jr., SHUMAKER LOOP & KENDRICK, LLP, Charlotte, North Carolina, for Appellee Carolinas Pathology Group, PA. Andrew L. Schlafly, Far Hills, New Jersey, for Amicus Curiae.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Dr. Vittal Shenoy filed suit against Carolinas Healthcare Systems (CHS) and Carolinas Pathology Group (CPG), alleging several claims arising from the termination of his employment. The district court granted summary judgment to the defendants, and we affirm.

I.

Because the district court granted summary judgment to CPG and CHS, we view the facts in the light most favorable to Shenoy. Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). Shenoy is a licensed pathologist in North Carolina. He began practicing pathology in Charlotte at Mercy Hospital. In 1992, Shenoy and a partner formed the Medical Laboratory Consultants of Charlotte, P.A. (MLCC), to provide pathology services to Mercy Hospital at its two campuses, Main and Pineville. Shenoy was the resident pathologist at Pineville, and his partner was stationed at Main. In 1995, CHS purchased Mercy Hospital and renamed its two campuses Carolinas Medical Center-Mercy (CMC-Mercy) and Carolinas Medical Center-Pineville (CMC-Pineville). CHS also operated two other hospitals in the area, CMC-University and CMC-Main. In addition to MLCC, CHS also contracted with CPG for pathology services. In 1998, CHS decided to award pathology services to a single entity and invited CPG and MLCC to bid for the award. During the bidding

3

process, Shenoy filed a corporate compliance complaint, alleging that CPG engaged in improper billing practices. CHS ultimately chose CPG for its pathology contract, and CPG thereafter offered employment to Shenoy's MLCC partner, but not Shenoy. CMC-Pineville's director, Curtis Copenhaver, intervened on Shenoy's behalf, and CPG eventually hired Shenoy. Shenoy remained at CMC-Pineville as an employee of CPG and was named the Medical Director of Laboratory at CMC-Pineville.

While at CMC-Pineville, Shenoy took a leading role on the hospital's peer review committees. Committee membership was voluntary; committee members received no compensation and were permitted to resign at any time. Neither CPG nor CHS supervised the committee. Shenoy volunteered to serve on CMC-Pineville's Medical Staff Quality Improvement Committee (MSQIC), which was responsible for peer review, and its Sentinel Events Committee (SEC), which addressed incidents of patient death or injury resulting from medical care. Shenoy chaired the MSQIC, and, as a result, often reported at meetings of the Medical Executive Committee (MEC).

Shenoy's relationship with CHS began to deteriorate in March 2005. At a March 9, 2005, meeting of the MSQIC, which Copenhaver and several other administrators attended, Shenoy criticized CMC-Pineville's administration for what he viewed as systemic failures leading to an alarming number of sentinel

4

events. Shenoy also complained that the administration was placing too much blame for these events on physicians. Shenoy next appeared at the March 15, 2005, meeting of the MEC to repeat his concerns. Several hospital administrators in attendance felt that Shenoy's behavior was unprofessional and damaged his relationship with CHS. Shenoy concedes that he raised his voice at the meetings, and provided the following description during his deposition:

> [I]t was like a ten minute – you know, it was a bully pulpit. I was the chairman and, you know, I used the opportunity to, you know, reprimand individuals who were interfering with the physician jury process, trying to absolve themselves of any responsibility for their own actions.

(J.A. 424-25.)

The day after the MSQIC meeting, Shenoy sent an email to two associates apologizing for his behavior at the meeting, explaining:

> I am sorry you gals had to witness a mess yesterday. . . . If you have a lower opinion of me I'm sorry I could not prevent that—I guess just like the Broadway tune—I gotta be me, I gotta be me.

(J.A. 457)

After Shenoy's comments at the meeting, Copenhaver decided that Shenoy was no longer employable at CMC-Pineville. Copenhaver thus requested that CPG remove Shenoy from his role at Pineville due to "personal attacks in open medical staff meetings on administration and hospital staff and due to lack of

5

support of CMC-Pineville and CHS." (J.A. 284). Copenhaver verbally requested that Shenoy not be assigned to Pineville or CMC-Mercy. In response, CPG attempted to reassign Shenoy but was unable to come to an agreement with him. Shenoy believed that any reassignment would have also limited his ability to sit on committees, a result he could not tolerate. Eventually, CPG terminated Shenoy's employment.

Unrelated to these events, in October 2003, Shenoy filed a sealed qui tam action under the False Claims Acts against CPG for several of its billing practices. Shenoy did not inform anyone of the complaint and eventually he voluntarily dismissed it. While there is no evidence in the record that CHS was aware of the qui tam action, there is some evidence several administrators were aware that there was an investigation by the federal Office of the Inspector General ("OIG") into CPG. OIG never revealed the nature of the investigation or the complainant. In February 2005, OIG informed CPG that the investigation was closed.

Shenoy filed this action in federal court, eventually pursuing just three claims: (1) a 42 U.S.C. § 1983 claim against CHS and CPG for First Amendment retaliation; (2) a tortious interference claim against CHS for disrupting his employment contract with CPG; and (3) a retaliation claim against CPG under the False Claims Act, 31 U.S.C. § 3729. Following discovery,

6

the district court orally granted CHS's motion for summary judgment on all three claims.  Shenoy filed a timely appeal, and we possess jurisdiction under 28 U.S.C. § 1291.

## II.

The district court granted summary judgment to CHS and CPG. We review this decision de novo.  Hardwick ex rel. Hardwick v. Heyward, -- F.3d --, 2013 WL 1189306, *4 (4th Cir. 2013). Summary judgment is appropriate if the "materials in the record," when construed in favor of the nonmoving party, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In conducting our review, we do not weigh the evidence, but rather we only determine whether there is a genuine issue for trial."  Hardwick, -- F.3d at --, 2013 WL 1189306, at *4 (internal quotation marks omitted).  Applying this standard, we review each of Shenoy's claims in turn.

## A.

Shenoy first contests the grant of summary judgment on his First Amendment retaliation claim.  In this claim, Shenoy contends that CHS violated his First Amendment rights by terminating him in retaliation for speaking out during the committee meetings.

The Supreme Court has recognized that public employees[*] may not "constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest." Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968). However, the First Amendment "does not require a public office to be run as a roundtable for employee complaints over internal office affairs." Connick v. Myers, 461 U.S. 138, 149 (1983). We thus apply a three-part test for determining whether a public employer has engaged in unlawful retaliation under the First Amendment. First, we discern "whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest." McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998). Next, assuming an employee can meet the public concern prong, we must determine "whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest" in managing the working environment. Id. If the employee has satisfied these two requirements, we then examine "whether the employee's speech was a substantial factor" in his termination. Id. at 277–78.

---

[*] Although Shenoy is employed by CPG and only has staff privileges at CHS, we use the public employee framework for analyzing his claim. See Bd. of County Comm'rs v. Umbehr, 518 U.S. 668, 677 (1996); Braswell v. Haywood Reg'l Med. Ctr., 234 Fed. App'x 47, 53 (4th Cir. 2007) (unpublished).

8

The first McVey criterion, whether the speech addressed a matter of public concern, is "the threshold question." Rankin v. McPherson, 483 U.S. 378, 384 (1987). If an employee's speech "cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize" the basis for the employee's termination. Connick, 461 U.S. at 146. We look at the speech's content, form, and context to determine if it addresses a matter of public concern. Id. at 147-48.

In Garcetti v. Ceballos, 547 U.S. 410 (2006), the Court refined Connick by holding that some speech is never on a matter of public concern—in that case, an internal memo circulated by a deputy prosecutor. The Court began by generally concluding that both Garcetti's choice to express his views at work and the fact that the memo related to Garcetti's employment were not "dispositive." Garcetti, 547 U.S. at 420-21. Instead, what was "dispositive" was the fact that "his expressions were made pursuant to his duties." Id. at 421 (emphasis added). Thus, Garcetti "asked a preliminary question: was the expression something done pursuant to the employee's professional duties? If so, then the First Amendment has no application." Davis v. Cook County, 534 F.3d 650, 653 (7th Cir. 2008).

In this case, the district court concluded that Shenoy's speech at the committee meetings fell within the ambit

of Garcetti and is unprotected under the First Amendment. The court found the statements at issue "were all made pursuant to his duties as chair of the [MSQIC] at the official meetings of the MSQIC and the Medical Executive Committee" and were "thus precisely the sorts of comments made . . . pursuant to official duties." (J.A. 838).

We find no error in the district court's analysis. Under Garcetti, the "ultimate question in determining whether speech falls within an employee's official duties is 'whether the employee speaks as a citizen or instead as a government employee.'" Rohrbough v. Univ. of Colo. Hosp. Auth., 596 F.3d 741, 746 (10th Cir. 2010) (quoting Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1203 (10th Cir. 2007)). Shenoy argues that because his committee work was voluntary and unpaid, it could not be part of his professional duties. We disagree. Speech that is "'not explicitly required as part of [an employee's] day-to-day job' may nevertheless fall within the scope of that employee's official duties." Id. at 749 (quoting Green v. Bd. of County Comm'rs, 472 F.3d 794, 800-01 (10th Cir. 2007)). We believe Shenoy's speech falls within this category; Shenoy's statements came at a committee meeting he was chairing and then at an MEC meeting he attended in his role as chairman of the MSQIC. The comments were not made in public and were made to people farther up the chain-of-command at CHS. Id.

10

at 747 ("speech directed at an individual or entity within an employee's chain of command is often found to be pursuant to that employee's official duties").

While Shenoy's roles on the committees were voluntary, once he accepted those roles, his service became part of his duties and his speech became covered by Garcetti. We accordingly affirm the district court's grant of summary judgment to CHS and CPG on this claim.

B.

Next, Shenoy contests the grant of summary judgment on his tortious interference with contract claim. This claim is only against CHS, and Shenoy alleges that CHS interfered with his contract with CPG, ultimately causing CPG to terminate his employment. The elements of a tortious interference claim in North Carolina are:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to [the] plaintiff.

United Lab., Inc. v. Kuykendall, 370 S.E.2d 375, 387 (N.C. 1988).

Although Shenoy was employed by CPG, he served as the pathologist at CMC-Pineville pursuant to the Pathology Services Agreement (PSA) between CHS and CPG. The PSA required CPG to

11

"provide for each Hospital a Specialist qualified to serve as the Medical Director of the Department of Pathology." (J.A. 860). The Director had to be acceptable to the hospital and "remain satisfactory to Hospital in the performance of his or her administrative duties," (J.A. 861). If the hospital informed CPG that the Director was no longer satisfactory, CPG was required to "take such action" that was "reasonably approved" by the hospital. (J.A. 861).

In granting summary judgment to CHS on this claim, the district court determined that, under the PSA, CHS had the absolute right to request Shenoy's removal. The "absolute rights" theory stems from Kelly v. Int'l Harvester Co., 179 S.E.2d 396, 403 (N.C. 1971).

In Kelly, a general manager at a franchise sued after the franchisor informed the franchisee that it had to fire the plaintiff or risk having its franchise terminated. The franchise contract provided that the franchisor had the unilateral right to request changes in management. Given this contractual right, the Kelly court held that any interference by the franchisor could not be a tort, explaining that "neither the exercise nor the threat to exercise a legal right may be considered tortious conduct." Id. The court then adopted the following recitation of that standard:

12

> Absolute rights, including primarily rights incident to the ownership of property, rights growing out of contractual relations, and the right to enter or refuse to enter into contractual relations, may be exercised without liability for interference without reference to one's motive as to any injury directly resulting therefrom. . . . In other words, acts performed with such an intent or purpose as to constitute legal malice and without justification, which otherwise would amount to a wrongful interference with business relations, are not tortious where committed in the exercise of an absolute right. 45 Am.Jur.2d, Interference § 23.

Id.

We agree with the district court that, because CHS's contract with CPG gave it the authority to request Shenoy's removal if he was no longer "satisfactory" to CHS, CHS' decision to "exercise" that "legal right" is not tortious conduct. Id. On appeal, Shenoy relies on a latter case, Smith v. Ford Motor Co., 221 S.E.2d 282 (N.C. 1976), that is, as the district court noted, "highly distinguishable." (J.A. 843). In Smith, the contract at issue did not give the defendant the unfettered right to remove the plaintiff—instead the contract provided for the plaintiff's removal only if "unsatisfactory" "from the standpoint of profits earned or the manner of operation of the corporation." Smith, 221 S.E.2d at 285 (emphasis omitted). Based on this language, the court found that "dissatisfaction for the stated reasons was intended by the parties to be the only justification" for the plaintiff's removal and that, accordingly, Kelly did not apply. Id. at 291 (emphasis in

13

original).  In contrast to Smith, but like Kelly, the PSA gave CHS the right to request Shenoy's removal if he was no longer satisfactory in his duties—a broader contractual right than at issue in Smith.

Moreover, even assuming Kelly does not control, we believe summary judgment on this count was still appropriate.  North Carolina makes a distinction in tortious interference cases between defendants who are "outsiders" and "non-outsiders" to the relevant contract.  An outsider is:

> one who was not a party to the terminated contract and who had no legitimate business interest of his own in the subject matter thereof.  Conversely, one who is a non-outsider is one who, though not a party to the terminated contract, had a legitimate business interest of his own in the subject matter.

Id. at 292.  "[N]on-outsiders often enjoy qualified immunity from liability for inducing their corporation or other entity to breach its contract with an employee," although this privilege may be "lost" if it is "exercised for motives other than reasonable, good faith attempts to protect the non-outsider's interests in the contract interfered with."  Lenzer v. Flaherty, 418 S.E.2d 276, 286 (N.C. Ct. App. 1992).

In this case, CHS would be a non-outsider because, while not a party to CPG's employment contract with Shenoy, it had a legitimate business interest of its own in the subject matter. Given its status as a non-outsider, CHS receives a qualified

14

privilege that is lost only if CHS acted with malicious motives. Shenoy has not produced sufficient evidence to suggest that CHS's actions are anything other than a "good faith attempt" to protect its "interests." Even accepting Shenoy's position that his behavior at the committee meetings was not disruptive, Shenoy has not put forth evidence to rebut CHS's argument that Shenoy's removal was due to a lack of support at CMC-Pineville and a concern about maintaining a collegial work environment—both of which are legitimate business interests. Accordingly, we affirm the grant of summary judgment on this claim as well.

## C.

Finally, Shenoy challenges the grant of summary judgment on his FCA retaliation claim. To state a claim for FCA retaliation, a plaintiff must prove "that (1) he took acts in furtherance of a qui tam suit; (2) his employer knew of these acts; and (3) his employer discharged him as a result of these acts." Zahodnick v. Int'l Bus. Machines Corp., 135 F.3d 911, 914 (4th Cir. 1997). The district court found that Shenoy could not prove causation (the third element) because, accepting his evidence, CPG knew that he was a qui tam relator "long before his date of termination." (J.A. 848). In the alternative, the court held that CPG demonstrated a legitimate non-retaliatory reason for the discharge and Shenoy failed to show that the justification was "not worthy of belief." (J.A. 848).

15

We affirm the district court's conclusion. CPG has consistently argued that no one at CHS or CPG knew that Shenoy had filed a qui tam complaint. To rebut this argument, Shenoy pointed out that CPG was aware in 1998 that Shenoy advised CHS of possible improper billing, that between 1998 and 2002 he told two CPG physicians that he was concerned about improper billing; and that in 2000 he told one CPG physician that he was preparing a possible qui tam action. We have serious doubts that this evidence is sufficient to show that CPG "knew" of Shenoy's acts "in furtherance" of his qui tam suit. Zahodnick, 135 F.3d at 914. Even assuming otherwise, however, these events all significantly predate Shenoy's termination in 2005. "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality. . . uniformly hold that the temporal proximity must be very close." Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001). Here, the temporal proximity is several years, which is simply not "very close" in time.

To avoid this conclusion, Shenoy argues that the relevant date is not the filing of his action, but rather the date on which OIG closed its investigation—February 2005. This argument is without merit; an employer retaliates under the FCA when it discharges an employee "as a result of" the employee taking

16

actions under the FCA.  <u>Zahodnick</u>, 135 F.3d at 914.  The focus is on the employer's response to Shenoy's actions, not OIG's actions.  Accepting Shenoy's evidence, CPG knew of Shenoy's actions by 2002, at the latest, more than three years before his termination.  We thus agree with the district court's conclusion that Shenoy cannot show causation and affirm its grant of summary judgment to CPG on this claim.

## III.

For the foregoing reasons, we affirm the district court's grant of summary judgment to CHS and CPG.

<u>AFFIRMED</u>