Remi Holdings, LLC v. IX WR 3023 HSBC Way L.P., 2016 NCBC 96.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 20503

REMI HOLDINGS, LLC,

          Plaintiff,

v.

IX WR 3023 HSBC WAY L.P.,
STARWOOD CAPITAL GROUP
HOLDINGS, LLC d/b/a STARWOOD
CAPITAL GROUP, JONES LANG
LASALLE AMERICAS, INC.,

          Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTIONS TO DISMISS**

1.    **THIS MATTER** is before the Court upon (i) Defendants IX WR 3023 HSBC Way L.P. ("Landlord") and Starwood Capital Group Holdings, LLC's ("Starwood") (together with Landlord, the "Starwood Defendants") Motion to Dismiss (the "Starwood Defendants' Motion") and (ii) Defendant Jones Lang LaSalle Americas, Inc.'s ("JLL") Motion to Dismiss ("JLL's Motion") (collectively, the "Motions") brought pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure in the above-captioned case. After considering the Motions, briefs in support of and in opposition to the Motions, and the arguments of counsel at a hearing on the Motions, the Court hereby **GRANTS** the Motions.

> *Moore & Van Allen, PLLC by Mark A. Nebrig and Glenn E. Ketner, III, for Plaintiff Remi Holdings, LLC.*
>
> *Troutman Sanders, LLP by Kiran H. Mehta, Samuel T. Reaves, and Kristen L. Schneider, for Defendants IX WR 3023 HSBC Way L.P. and Starwood Capital Group Holdings, LLC d/b/a Starwood Capital Group.*
>
> *Cozen O'Conner by Tracy L. Eggleston and Patrick M. Aul, for Defendant Jones Lang LaSalle Americas, Inc.*

Bledsoe, Judge.

## I.

## PROCEDURAL AND FACTUAL BACKGROUND

2. The Court does not make findings of fact on motions to dismiss under Rule 12(b)(6), but only recites those facts included in the Complaint that are relevant to the Court's determination of the Motions.

3. This case arises out of a failed negotiation of a commercial lease. Plaintiff Remi Holdings, LLC ("Remi" or "Plaintiff") is engaged in the business of providing customized equipment maintenance programs, and it currently leases office space in Charlotte from Irby Building, LLC (the "Irby Lease"). (Compl. ¶¶ 1, 10.) In late 2014, on account of its growing business, Plaintiff sought to take advantage of an upcoming early termination option on the Irby Lease and seek alternative commercial rental space that better suited its needs. (Compl. ¶ 12.) The Irby Lease allowed Remi to terminate the lease early on February 29, 2016 if Remi gave written notice 180 days in advance. (Compl. ¶ 10.) In early 2015, Plaintiff approached JLL, the Starwood Defendants' commercial real estate agent, and expressed interest in leasing the third floor of a building known as the Edgewater Corporate Center ("Edgewater"). (Compl. ¶ 12.) Plaintiff alleges that Landlord operates Edgewater and that Landlord is a mere instrumentality of Starwood. (Compl. ¶ 4.) The Starwood Defendants had hired JLL as their real estate agent in anticipation of a master lease expiration that would occur in 2016. (Compl. ¶ 13.)

4. The parties began discussing Remi's potential lease of the third floor of Edgewater, and Remi alleges that, relying on Defendants' representations regarding the availability of the third floor of Edgewater, Remi hired a consultant in February 2015 to help plan for construction and relocation. (Compl. ¶ 19.)

5. Plaintiff sent a letter of intent in April 2015 to the Starwood Defendants, setting out the proposed terms of a potential lease ("Letter of Intent" or "Letter").

6. The Letter of Intent contained a disclaimer stating that "[t]he terms and conditions outlined herein shall not be binding on either party until incorporated into a lease document, in form and substance, acknowledged and agreed to by both parties, and fully executed by both Landlord and Tenant." (Compl. Ex. A, hereafter "LOI," 6.) Furthermore, the Letter of Intent stated that its terms were contingent upon: "1) Landlord securing a successful buyout arrangement with HSBC of its 3rd floor lease obligation, and; 2) Landlord's guarantee that the Possession Date of November 1, 2015 will be met." (LOI 6.) In its final paragraph, the Letter of Intent stated that "while this Letter of Intent is non-binding, it does represent the good faith and good will of each party[.]" (LOI 7.) On April 30, 2015, the Starwood Defendants' real estate broker, JLL, informed Plaintiff via e-mail that the Starwood Defendants accepted the terms of the Letter of Intent. (Compl. ¶ 25.) The Complaint, however, is devoid of any allegations that the contingencies were met.

7. Plaintiff, JLL, Landlord, and Starwood all proceeded to exchange comments and drafts of a potential lease from June until August of 2015. In anticipation of the upcoming move, Plaintiff incurred costs related to initial space programming,

architecture and planning costs, construction consulting services, and relocation. (Compl. ¶ 35.) On August 12, 2015, Defendants transmitted to Plaintiff a "final draft lease" (the "Final Draft Lease" or the "Lease"). (Compl. ¶ 39.) The Final Draft Lease contained a clause stating that it was transmitted for "review only and the delivery of it does not constitute an offer to [Plaintiff] or an option."[1] (Starwood Defs.' Br. Opp. Mot. Dismiss Ex. B., hereinafter "Lease," § 29.10.) Two days later, Plaintiff signed the Final Draft Lease and transmitted the document to Defendants anticipating that they would countersign the document. (Compl. ¶ 40.) Defendants allegedly represented that they would sign the Lease document as soon as the sublease with the current tenant leasing the Edgewater Space was terminated. (Compl. ¶ 43.) The Starwood Defendants purportedly renounced the Final Draft Lease without signing and on September 21, 2015 informed Plaintiff that they would instead lease the Edgewater Space to TriNet, an entity with whom the Starwood Defendants had allegedly been negotiating for months without Plaintiff's knowledge. (Compl. ¶¶ 45, 47.) As a result, Plaintiff missed its early termination deadline in the Irby Lease. (Compl. ¶ 49.)

8. Plaintiff commenced this action on October 30, 2015 by filing its Complaint, alleging claims against the Starwood Defendants for breach of contract, breach of the duty of good faith and fair dealing, breach of the duty to negotiate in good faith, and

---

[1] The Starwood Defendants attached the Final Draft Lease to their Motion to Dismiss. "When ruling on a Rule 12(b)(6) motion, a court may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001).

unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1. Plaintiff additionally asserted claims against JLL for tortious interference with contract and with prospective economic advantage. The Starwood Defendants and JLL filed separate motions to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. The Motions are ripe for resolution.

## II.

## LEGAL STANDARD

9. The overarching question for the Court on a motion to dismiss under N.C. R. Civ. P. Rule 12(b)(6) is "whether as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Harris v. NCNB Nat'l Bank of North Carolina,* 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987) (citing *Stanback v. Stanback*, 297 N.C. 181, 185, 254 S.E.2d 611, 615 (1979)). Furthermore, the "complaint must be liberally construed, and the court should not dismiss the complaint unless it appears beyond a doubt that the plaintiff could not prove any set of facts to support his claim which would entitle him to relief." *Block v. County of Person,* 141 N.C. App. 273, 277–78, 540 S.E.2d 415, 419 (2000). Factual allegations must be accepted as true; however, bare legal conclusions are "not entitled to a presumption of truth." *Miller v. Rose,* 138 N.C. App. 582, 592, 532 S.E.2d 228, 235 (2000).

III.

ANALYSIS

A. Starwood Defendants' Motion to Dismiss

    a. Breach of Contract—Letter of Intent

10. Plaintiff alleges that the Letter of Intent was a "binding preliminary agreement" and therefore a "valid contract," the terms of which the Starwood Defendants breached. (Compl. ¶¶ 27, 51.) The Starwood Defendants, in their Motion to Dismiss, contend that the Letter of Intent is not an enforceable contract because it "indicates on its face that it is a non-binding and unenforceable agreement to agree." (Starwood Defs.' Mot. Dismiss 3.) Further, the Starwood Defendants contend that Starwood "never assented to the terms of the Letter of Intent, which is indicated by the fact that it never signed the Letter of Intent." (Starwood Defs.' Br. Supp. Mot. Dismiss 6.)

11. In order to state a claim for breach of contract, a plaintiff must adequately allege the existence of a valid contract and the breach of the terms of that contract. *Charlotte Motor Speedway, LLC v. County of Cabarrus,* 230 N.C. App. 1, 6, 748 S.E.2d 171, 175 (2013). In North Carolina, "a valid contract requires (1) assent; (2) mutuality of obligation; and (3) definite terms." *Id.* at 7, 748 S.E.2d at 176. *See also Elks v. N. State Ins. Co.,* 159 N.C. 619, 624–26, 75 S.E. 808, 810–11 (1912) ("There is no contract unless the parties thereto assent, and they must assent to the same thing, in the same sense."). Mutual assent is often understood as a "meeting of the minds," occurring when the parties demonstrate an intent to be bound by definite terms.

*Parker v. Glosson*, 182 N.C. App. 229, 232, 641 S.E.2d 735, 737 (2007). "[A] contract to enter into a future contract," such as a letter of intent, "must specify all its material and essential terms, and leave none to be agreed upon as a result of future negotiations." *Boyce v. McMahan*, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974). If such a contract leaves material portions open for future agreement, it "is nugatory and void for indefiniteness." *Id.* When considering the document at issue in *Boyce*, which identified itself as a preliminary agreement and stated that the parties would enter into a more detailed agreement at some undecided future date, the Supreme Court concluded that the writing "express[ed] the desires of the parties but not the agreement of both." *Id.*

12.     This Court in particular has found unenforceable letters of intent that contain an affirmative declaration of their non-binding effect. In *JDH Capital, LLC v. Flowers*, the Court held as non-binding a letter of intent where:

> (1) the document . . . says on its face it is a letter of intent and that it is non-binding, (2) the document contemplates the execution of a more complete agreement, (3) there is no language inferring an intent to be bound, and (4) a comparison of the length of the Letter of Intent and the proposed joint venture agreement demonstrates the numerous material terms yet to be determined when the Letter of Intent was signed.

2009 NCBC LEXIS 8, at *15 (N.C. Super. Ct. Mar. 13, 2009). In reaching that conclusion, the court in *JDH Capital* specifically relied on *Durham Coca-Cola Bottling Co. v. Coca-Cola Bottling Co. Consol.*, 2003 NCBC LEXIS 5, at *26 (N.C. Super. Ct. Apr. 28, 2003). Similar to the letter in *JDH Capital*, the letter of intent in *Durham Coca-Cola Bottling* "by its own terms and within its four corners indicates that it is an agreement to agree at a later date," because it contemplated a definitive future

agreement and purported to represent only the parties' good faith agreement in principle to its terms. *Id.*

13. Here, the Letter of Intent contains a fair amount of specificity as to the terms of the purported agreement. Nevertheless, certain details are left undecided for the lease, and the Final Draft Lease is much longer and more detailed than the Letter of Intent. Furthermore, the Letter of Intent repeatedly emphasizes its non-binding nature and makes its terms contingent upon a buyout of Landlord's other lease obligations and Landlord's guarantee of a specified date of possession. The Letter opens by stating that it "serve[s] as [Remi's] intent to enter into a lease agreement with Starwood on the following terms and conditions." (LOI 1.) A separate clause provides in full:

> This Letter of Intent is not be construed in any manner as an obligation on the part of the tenant to enter into a lease agreement with the Landlord. The terms and conditions outlined herein shall not be binding on either party until incorporated into a lease document, in form and substance acknowledged and agreed to by both parties, and fully executed by both Landlord and Tenant.

(LOI 6.) The Letter concludes by stating that, "[w]hile this Letter of Intent is non-binding, it does represent the good faith and good will of each party to act and execute in a manner that accomplishes the end result of a March 1, 2016 open for business date for Remi at Edgewater[.]" (LOI 7.) Like the letter of intent in *JDH Capital*, the Letter is silent on potential remedies that might result from a breach.

14. The Court concludes that the Letter of Intent does not contain language within its four corners to give rise to a binding contract. The Letter's explicit terms provide that it is not a document intended to bind the parties to future action. While

the Letter of Intent does explicitly state that the document "represent[s] the good faith and good will of each party," the Court concludes that such a phrase is insufficient to create an inference of the parties' intent to be bound in the face of the explicit language describing the document as non-binding. Consistent with *Durham Coca-Cola Bottling Co.*, 2003 NCBC LEXIS 5, at *27, the Letter's representation of the parties' "good faith and good will" does not give rise to a binding agreement in the face of repeated explicit terms regarding the Letter's non-binding effect. The Letter of Intent also makes its terms contingent upon two specific occurrences, and the Complaint lacks any allegations that those events did in fact occur. The Letter of Intent therefore represents the desires, but not the binding agreement, of the parties, and Plaintiff's claim for breach of the Letter of Intent fails as a matter of law.

b. Breach of Contract—Final Draft Lease

15. Plaintiff further alleges that the Final Draft Lease was a binding and valid contract, which the Starwood Defendants breached by leasing the Edgewater space to TriNet rather than to Plaintiff. The Starwood Defendants argue that Plaintiff's claim fails for lack of mutual assent because the Starwood Defendants provided the lease document not as an offer but "for Tenant's review only." In support of their argument, the Starwood Defendants also argue that the Lease fails under North Carolina's statute of frauds, which requires leases with a term of at least three years to be in writing and signed by the party to be charged. N.C. Gen. Stat. § 22-2.

16. As an initial matter, the Court cannot entertain the Starwood Defendants' statute of frauds argument for dismissal at this point in the litigation. "It is

inappropriate to consider, for purposes of a motion under 12(b)(6), whether [a] contract fails to comport with the statute of frauds, because the defense that the statute of frauds bars enforcement of a contract is an affirmative defense that 'can only be raised by answer or reply.'" *Brooks Distrib. Co. v. Pugh*, 91 N.C. App. 715, 723–24, 373 S.E.2d 300, 305 (1988) (Cozort, J., dissenting), *rev'd*, 324 N.C. 326, 378 S.E.2d 31 (1989) (per curiam) (adopting Judge Cozort's dissenting opinion). *See also Green v. Harbor*, 113 N.C. App. 280, 281, 437 S.E.2d 719, 720 (1994) (describing as "settled" the rule that the statute of frauds cannot be taken advantage of on a motion to dismiss) (quoting *Weant v. McCanless*, 235 N.C. 384, 386, 70 S.E.2d 196, 197 (1952)); *In re Freeway Foods of Greensboro, Inc.*, 467 B.R. 853, 861–62 (Bankr. M.D.N.C. 2012) (collecting cases).

17.    Nevertheless, the Starwood Defendants allege that the Final Draft Lease lacks mutual assent and is therefore not a valid contract. Plaintiff alleges that the Starwood Defendants made an offer on August 21, 2015 by delivering the Lease to Plaintiff, which Plaintiff accepted by signing and returning the Lease to the Starwood Defendants. (Compl. ¶¶ 39–40.) The Starwood Defendants contend that the August 21, 2015 delivery of the Final Draft Lease specifically disclaimed that it was an offer and thus did not create the power of acceptance in Plaintiff.

18.    "There is no meeting of the minds, and, therefore, no contract, when 'in the contemplation of both parties . . . something remains to be done to establish contract relations.'" *Parker*, 182 N.C. App. at 232, 641 S.E.2d at 737 (quoting *Fed. Reserve Bank v. Neuse Mfg. Co. Inc.*, 213 N.C. 489, 493, 196 S.E. 848, 850 (1938)). Because

parties must agree to the same thing in the same sense, "when negotiating parties make it clear that they do not intend to be bound by a contract until a formal written agreement is executed, no contract exists at that time." *Id.* In this case, the Final Draft Lease that Plaintiff signed included a provision stating that "Landlord has delivered a copy of this Lease to Tenant for Tenant's review only and the delivery of it does not constitute an offer to Tenant or an option." (Lease § 29.10.) The Starwood Defendants argue that this clause affirms the Letter of Intent's anticipation of "a lease document, in form and substance acknowledged and agreed to by both parties, and, fully executed by both Landlord and Tenant." (LOI 6.)

19. In response, Plaintiff argues that the Starwood Defendants should be estopped from relying on section 29.10 of the Final Draft Lease. (Pl.'s Br. Opp. Starwood Mot. Dismiss 13.) Plaintiff directs the Court to allegations that:

> [O]n August 12, 2015, [Plaintiff's agent] informed JLL [and the Starwood Defendants] that the final lease needed to be signed by August 21, 2015. That same day, JLL responded on behalf of itself [and the Starwood Defendants] that they understood the urgency, and with the lease review and revision process completed, JLL provided an updated and revised final draft lease to Remi.

(Compl. ¶¶ 38–39.) Plaintiff contends that these allegations are sufficient to demonstrate that the Lease delivered to it on August 12, 2015 was an offer. However, reading these allegations in the light most favorable to Plaintiff, the allegation that the Starwood Defendants sent "an updated and revised final draft lease" does not overcome the explicit language in section 29.10 that the Starwood Defendants were not providing the Lease as an offer. Plaintiff's contention that section 29.10 was

unintentionally left in the "final draft Lease" is not supported by language in the Complaint.[2]

20.     After careful review, the Court concludes that the Final Draft Lease does not evince an intent to be bound on the part of the Starwood Defendants.  In *Howlett v. CSB, LLC*, 164 N.C. App. 715, 596 S.E.2d 899 (2004), the Court of Appeals reached the same conclusion under similar circumstances.  In that case, the Court concluded that the plaintiff's signing of a lease document did not evince an intent to be bound by the defendants, who had provided the documents to plaintiffs, identified the document as a proposed lease agreement, and included language anticipating a final executed agreement.  *Id.* at 720, 596 S.E.2d at 903.[3]  In this case, the Starwood Defendants withheld their consent to be bound by expressly including language that the Lease draft provided to Plaintiff was not an offer and was tendered only for negotiation purposes.  As such, Plaintiff cannot establish that its signature and delivery of the Final Draft Lease created a binding contract, and Plaintiff's claim for breach of the lease agreement therefore must fail.[4]

---

[2]  In support of this argument, Plaintiff attached to its response brief e-mails between the parties leading up to the exchange of the Lease on August 12, 2015.  (Pl.'s Br. Opp. Starwood Mot. Dismiss Ex. B.)  The Court declines to consider those limited e-mails here, as doing so would convert this to a Rule 56 motion for summary judgment.  *Raintree Homeowners Ass'n, Inc. v. Raintree Corp.*, 62 N.C. App. 668, 673, 303 S.E.2d 579, 581–82 (1983).

[3]  Although not binding here, the Court finds persuasive the Eastern District of New York's application of basic contract principles under similar facts, *Coney Island Resorts, Inc. v. Giuliani*, 00 CV 2233 (ILG), 2000 U.S. Dist. LEXIS 8354, at *16 (E.D.N.Y. May 10, 2000) (holding that transmission by a party of a draft lease "clearly marked 'draft'" did not "operate to create a valid and enforceable lease" when it was not signed by the transmitting party).

[4]  Although the Court declines to consider the e-mails Plaintiff has attached to its response in resolving the Starwood Defendants' Motion to Dismiss, *see supra* note 2, the Court has reviewed those e-mails for the limited purpose of determining whether Plaintiff could

c. Breach of the Duty of Good Faith and Fair Dealing

21. Plaintiff brings claims against the Starwood Defendants for breach of the duty of good faith and fair dealing with respect to both the Letter of Intent and the Final Draft Lease. "In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985) (citation omitted). Because the Court has already concluded that Plaintiff had no binding contracts with the Starwood Defendants, Plaintiff's claim for breach of the implied covenant of good faith and fair dealing must fail. *See Suntrust Bank v. Bryant/Sutphin Prop., LLC*, 222 N.C. App. 821, 833, 732 S.E.2d 594, 603 (2012) ("As the jury determined that plaintiff did not breach any of its contracts with defendants, it would be illogical for this Court to conclude that plaintiff somehow breached implied terms of the same contracts.").

d. Breach of the Duty to Negotiate in Good Faith

22. Plaintiff alleges that "in the alternative, if the Court finds that Remi and Starwood and/or Landlord did not reach a final agreement in the Letter of Intent

---

successfully re-plead this claim following a dismissal without prejudice. After careful review, the Court concludes that Plaintiff's e-mails are not sufficiently particular to defeat the explicit language in section 29.10. In fact, the e-mails indicate that Plaintiff's broker was the last party to make substantive changes to the Lease terms. Therefore, even if Plaintiff re-pleaded the claim, it would still need to demonstrate that the Starwood Defendants would have agreed to the elimination of section 29.10 such that Plaintiff's signature on the Final Draft Lease was an acceptance rather than an offer. Plaintiff has forecast no such evidence. The Court, therefore, in the exercise of its discretion, determines that dismissal of this claim without prejudice is not merited. *See Johnson v. Bollinger*, 86 N.C. App. 1, 8–9, 356 S.E.2d 378, 383 (1987) (discussing the trial court's broad discretion to grant a dismissal with or without prejudice).

and/or the Lease," the Starwood Defendants breached a duty to negotiate in good faith with Plaintiff. (Compl. ¶ 80.) In a matter of first impression in North Carolina, the Business Court recently allowed a claim for breach of the duty to negotiate in good faith in *RREF BB Acquisitions, LLC v. MAS Props., LLC*, 2015 NCBC LEXIS 61 (N.C. Super. Ct. June 9, 2015) (McGuire, J.). *See also Insight Health Corp. v. Marquis Diagnostic Imaging of NC, LLC*, 2016 NCBC LEXIS 77 (N.C. Super. Ct. Oct. 7, 2016) (discussing *RREF* at length). North Carolina's appellate courts have not recognized such a claim, and did not have the opportunity to directly review *RREF* because the parties stipulated to a dismissal prior to any appeal.

23. Under the unique facts of *RREF*, which involved negotiations for a loan workout between parties who had a twenty-year history of doing business, the court concluded that an agreement to negotiate in good faith could be enforceable. The *RREF* opinion held that an agreement to continue to negotiate in good faith could be enforceable, "provided that it met all of the requirements for contract formation under North Carolina law," because North Carolina law already implies in every contract a duty of good faith and fair dealing. *RREF*, 2015 NCBC LEXIS 61, at *57. *RREF* concluded that a duty to negotiate in good faith would not arise spontaneously or independently, but may arise from a binding "preliminary agreement" between parties to continue negotiations. *Id.* at *53–54 (quoting *Sony Ericsson Mobile Communs. USA, Inc. v. Agere Sys.,* 2007 NCBC LEXIS 28, *7–10 (N.C. Super. Ct. Aug. 27, 2007) (applying New York law to acknowledge preliminary agreements to

negotiate as enforceable and capable of obligating parties "to continue to negotiate all terms in good faith")).

24. In allowing the claim to proceed past summary judgment, the court in *RREF* found that the claimant had proffered sufficient evidence to allow a determination that the parties had made a contract, one of the terms of which was an agreement to continue to negotiate in good faith. *RREF*, 2015 NCBC LEXIS 61, at \*57–58.

25. Plaintiff alleges that its negotiations with the Starwood Defendants at least gave rise to a binding agreement to negotiate in good faith, which the Starwood Defendants allegedly breached by repudiating the Letter of Intent and/or the Lease, and purporting to lease the Edgewater Space to TriNet. (Compl. ¶¶ 80–81.) According to Plaintiff, the agreement to negotiate in good faith arose from the Letter of Intent, which stated:

> While this Letter of Intent is non-binding, it does represent the good faith and good will of each party to act and execute in a manner that accomplishes the end result of a March 1, 2016 open for business date for Remi at Edgewater, while following the terms and conditions outlined herein.

(LOI 7.)

26. The Court is not persuaded that this representation of the parties' good faith and good will creates a binding agreement to negotiate in good faith. In *RREF*, the court concluded that the jury could find a binding agreement based on the parties' course of conduct in negotiating the final deal. Here, however, Plaintiff argues that the parties' entry into the Letter of Intent also created a binding agreement to negotiate in good faith. The Court has already concluded that the Letter of Intent is

not a binding preliminary agreement under *Boyce* and related cases. Without further factual allegations, the Court concludes that the same conduct that failed to give rise to a binding preliminary agreement does not give rise to a binding agreement to negotiate in good faith. In other words, having concluded that the Letter of Intent "expresses the desires of the parties but not the agreement of both," *Boyce*, 285 N.C. at 734, 208 S.E.2d at 695, it would be illogical to conclude that a perfunctory reference to the parties' good faith in that same Letter of Intent creates a binding agreement.

27.    Whether or not our appellate courts eventually recognize a claim for the breach of the duty to negotiate in good faith as described in *RREF*, the Court concludes that Plaintiff has not pleaded the existence of a binding agreement to negotiate meeting "all of the requirements for contract formation under North Carolina law," which was an essential element of the claim allowed in *RREF*. 2015 NCBC LEXIS 61, at *57. As a result, Plaintiff's claim must be dismissed.

e. Unfair and Deceptive Trade Practices

28.    Plaintiff alleges that the Starwood Defendants' conduct rises to the level of an unfair or deceptive trade practice under N.C. Gen. Stat. § 75-1.1. Plaintiff alleges its claim must survive the Starwood Defendants' Motion because (1) the *RREF* Court allowed a Chapter 75 claim on the basis of the same conduct that supported the claim for breach of the duty to negotiate in good faith, and (2) Plaintiff has alleged substantial aggravating circumstances attendant to a breach of contract. (Pl.'s Br. Opp. Starwood Mot. Dismiss 21.) This Court has concluded that Plaintiff's claims for

breach of the duty to negotiate in good faith and breach of contract must be dismissed. Therefore, both of Plaintiff's arguments fail.

29. The Court additionally notes that Plaintiff's allegations do not describe unfair or deceptive conduct sufficient to state a claim under Chapter 75. *See Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001) ("In order to establish a *prima facie* claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice . . . ."). The Court of Appeals has held that conduct similar to that alleged here does not violate Chapter 75. In *Computer Decisions v. Rouse Office Management*, the plaintiff negotiated to lease office space from the defendants. 124 N.C. App. 383, 385, 477 S.E.2d 262, 263 (1996). The parties engaged in detailed negotiations, apparently agreeing to all the terms of the proposed lease agreement. *Id.* at 385–86, 477 S.E.2d at 263–64. The parties failed to execute the lease, and the defendant instead leased the property to another tenant with whom it had been in negotiations. *Id.* The court dismissed plaintiff's Chapter 75 claim, concluding that "by deciding not to pursue lease negotiations with plaintiff, defendants were simply exercising their right to contract freely with whomever they choose." *Id.* at 390, 477 S.E.2d at 266. Under the similar facts in this case, the Starwood Defendants have likewise exercised their freedom to contract, and Plaintiff has failed to allege unfair or deceptive conduct sufficient to maintain a Chapter 75 claim. Therefore, Plaintiff's claim for unfair and deceptive trade practices must be dismissed.

B. JLL's Motion to Dismiss

30. Plaintiff asserts claims against JLL for tortious interference with contract and tortious interference with a prospective business advantage. JLL's Motion seeks dismissal of both claims.

a. Tortious Interference with Contract

31. In order to plead a claim for tortious interference with contract in North Carolina, a plaintiff must allege "(1) the existence of a valid contract between plaintiff and a third party; (2) knowledge by defendant of the contract; (3) acts by defendant to intentionally induce the third party not to perform the contract; (4) defendant's acts were committed without justification; and (5) actual damage to the plaintiff." *Barker v. Kimberly-Clark Corp.*, 136 N.C. App. 455, 462, 524 S.E.2d 821, 826 (2000). Plaintiff alleges that it had a valid contract with the Starwood Defendants, which JLL intentionally induced the Starwood Defendants not to perform. The Court has determined above that neither the Letter of Intent nor the Final Draft Lease were valid contracts. As such, Plaintiff's Complaint is unable to satisfy an essential element of the claim, and Plaintiff's claim for tortious interference with contract against JLL fails as a matter of law. *See Cobra Capital, LLC v. RF Nitro Commc'ns, Inc.*, 266 F. Supp.2d 432, 439 (M.D.N.C. 2003) (dismissing a tortious interference claim under North Carolina law where the underlying document was merely a non-binding proposal of terms for a later contemplated contract).

b. Tortious Interference with Prospective Economic Advantage

32. To state a claim for tortious interference with prospective economic advantage, Plaintiff "must allege facts to show that [JLL] acted without justification in inducing a third party to refrain from entering into a contract with [Plaintiff] which contract would have ensued but for the interference." *Walker v. Sloan*, 137 N.C. App. 387, 393, 592 S.E.2d 236, 242 (2000) (citation omitted). Plaintiff alleges that, in the alternative, if the Letter of Intent and the Final Draft Lease were not binding contracts, JLL tortiously induced the Starwood Defendants from entering into those contracts. (Compl. ¶¶ 75–76.)

33. For tortious interference claims, North Carolina distinguishes between outsiders and non-outsiders to the transaction. Non-outsiders are those who, while not a party to the contract or the prospective contract, have a legitimate business interest in the subject matter. *Smith v. Ford Motor Co.*, 289 N.C. 71, 87, 221 S.E.2d 282, 292 (1976). A non-outsider enjoys qualified immunity from liability on a tortious interference claim. *Combs v. City Elec. Supply Co.*, 203 N.C. App. 75, 84, 690 S.E.2d 719, 725 (2010). A non-outsider loses qualified immunity if the non-outsider acts with "legal malice." *Varner v. Bryan*, 113 N.C. App. 697, 702, 440 S.E.2d 295, 298 (1994). "A person acts with legal malice if he does a wrongful act or exceeds his legal right or authority in order to prevent the continuation of the contract between the parties." *Id.*

34. In this case, JLL served as the real estate broker for the Starwood Defendants. JLL therefore had a legitimate business interest in securing a lease on

the Edgewater space for the Starwood Defendants, and JLL is a non-outsider for purposes of a tortious interference claim. *See, e.g., Rhodes, Inc. v. Morrow*, 937 F. Supp. 1202, 1216 (M.D.N.C. 1996) (holding that an attorney, as a representative of the client, was a non-outsider with respect to transactions on which the attorney advised the client). Therefore, Plaintiff must allege that JLL acted with legal malice in inducing the Starwood Defendants not to enter into contracts with Plaintiff. The Complaint lacks factual allegations, however, that JLL intentionally performed a wrongful act or exceeded its legal right or authority in order to prevent the Starwood Defendants from entering into a contract with Plaintiff. Plaintiff therefore has failed to plead an essential element of the claim, and Plaintiff's claim for tortious interference with a prospective economic advantage must fail.

IV.

CONCLUSION

35. For the foregoing reasons, the Court hereby **GRANTS** the Starwood Defendants' Motion to Dismiss and **GRANTS** JLL's Motion to Dismiss.

36. Accordingly, Plaintiff's claims and this action are hereby dismissed with prejudice.

**SO ORDERED**, this the 12th day of December, 2016.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
 for Complex Business Cases