Bldg. Ctr., Inc. v. Carter Lumber, Inc., 2017 NCBC 83.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 4186

THE BUILDING CENTER, INC.,

Plaintiff,

v.

CARTER LUMBER OF THE NORTH,
INC., a North Carolina Corporation,
CARTER LUMBER OF THE SOUTH,
INC., a South Carolina Corporation,
and TIMOTHY HURD,

Defendants.

**OPINION AND ORDER ON
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

THIS MATTER comes before the Court upon Carter Lumber of the North, Inc., a North Carolina Corporation's (Carter Lumber–NC), Carter Lumber of the South, Inc., a South Carolina Corporation's (Carter Lumber–SC)[1] (collectively Carter Lumber–NC and Carter Lumber–SC are "Carter Lumber"), and Timothy Hurd's (collectively, Carter Lumber and Hurd are "Defendants") Motion for Summary Judgment ("the Motion") pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Rule(s)").

THE COURT, having considered the Motion, briefs in support of and in opposition to the Motion, the evidentiary materials filed by the parties, and the arguments of counsel at the hearing, concludes that the Motion should be GRANTED for the reasons below.

*Moore & Van Allen, PLLC, by Benjamin P. Fryer, Esq. and William M. Butler, Esq. for Plaintiff The Building Center, Inc.*

---

[1] Carter Lumber–NC and Carter Lumber–SC are wholly owned by the Carter-Jones Companies, Inc., a Michigan Corporation, whose headquarters and corporate offices are located in Kent, Ohio.

*Van Hoy, Reutlinger, Adams & Dunn, PLLC, by Stephen J. Dunn, Esq. for Defendants Carter Lumber of the North, Inc., a North Carolina Corporation and Carter Lumber of the South, Inc., a South Carolina Corporation, and Timothy Hurd.*

McGuire, Judge.

<u>FACTUAL AND PROCEDURAL BACKGROUND</u>

1. While findings of fact are not necessary or proper on a motion for summary judgment, "it is helpful to the parties and the courts for the trial judge to articulate a summary of the material facts which he considers are not at issue and which justify entry of judgment." *Collier v. Collier*, 204 N.C. App. 160, 161–62, 693 S.E.2d 250, 252 (2010). Therefore, the Court limits its recitation to the facts necessary to decide the Motion and not to resolve issues of material fact.

A. *Plaintiff and Carter Lumber*

2. Plaintiff The Building Center, Inc. ("Plaintiff" or "TBC") is engaged in the supply and distribution of lumber and building materials ("LBM") to building contractors and other customers. Plaintiff has six locations in North and South Carolina, including Pineville and Gastonia, North Carolina, and Rock Hill, South Carolina. (Second Amended Verified Complaint, ECF No. 36, Ex. A at ¶¶ 1, 8.) At all times relevant to this matter, Skip Norris was Plaintiff's President.

3. Carter Lumber is also an LBM supplier, which operates in and around the Mecklenburg County area (Seder Dep., ECF No. 25.3 at Ex. F ¶¶ 5-7, 19.) Carter Lumber operates locations in Charlotte, North Carolina, and Rock Hill, South Carolina. (*Id.*)

4.      Plaintiff and Carter Lumber are competitors in the LBM business. It is undisputed that Sales in the LBM business are conducted by outside sales representatives who call on contractors and other customers ("Sales Representatives").

B.      *Timothy Hurd*

5.      Defendant Timothy Hurd ("Hurd") was Residential Sales Manager for Plaintiff's Pineville, Gastonia, and Rock Hill locations from approximately October 8, 2012, until January 2015. (Hurd Aff., ECF No. 25.14 at ¶ 4.) Hurd managed Plaintiff's Sales Representatives, including training, performance evaluations, and development of individual short and long-term strategic sales plans. (ECF No. 36, Ex. A at ¶ 18.) Hurd had knowledge about Sales Representatives' compensation, the customers they serviced, and the profitability of Sales Representatives' customers. (ECF No. 36, Ex. A at ¶¶ 18—22.)

6.      Hurd also had access to Plaintiff's proprietary and confidential business information. Plaintiff alleges the proprietary and confidential business information included, *inter alia*: "names and contacts of customers;" "customer preferences, including the needs, requirements, and values of [Plaintiff's] customers;" "sales and marketing strategies;" "pricing structures;" "margins and profits;" "manufacturing technologies;" and "other confidential business information." (ECF No. 36, Ex. A at ¶ 12.) It is undisputed that Hurd had access to detailed customer sales histories and information that was stored in a program called "BisTrack" and in other sales reporting programs. (Philip Dep., ECF No. 35, Ex. 41 at pp. 27—36.) BisTrack and the

sales reporting programs are username and password-protected. (ECF No. 35, Ex. 41 at p. 36.)

7.    Plaintiff did not have a written non-competition or confidentiality agreement with Hurd.

8.    On January 23, 2015, Hurd resigned from employment with Plaintiff and became employed with Surface Products, Inc., a countertop fabricator in Cornelius, North Carolina. (ECF No. 35, Ex. 37 at pp. 13–14.) Shortly before resigning from Plaintiff, Hurd emailed a list of customers' names and email addresses from his work email account to his personal email account (the "Hurd Customer List"). (Hurd Dep., ECF No. 25.20 at pp. 54–55.) Plaintiff does not claim that Hurd took any other proprietary or confidential information from Plaintiff in a tangible format prior to his resignation.

C.    *Carter Lumber's employment of Hurd and recruitment of Plaintiff's Sales Representatives*

9.    It is undisputed that at all times relevant to this lawsuit, Carter Lumber was seeking to expand in the Charlotte and Rock Hill markets. (ECF No. 36, Ex. A at ¶ 10.) Beginning in 2013, Carter Lumber sought to expand its business in the Charlotte metropolitan market. (Kujawski Aff., ECF. No. 25.12 at ¶¶ 6.) As part of this expansion effort, Carter Lumber hired Sales Representatives and other employees from competitors including Pro Build, Stock Building Supply, 84 Lumber, and Plaintiff. (*Id.* at ¶ 7.)

10.    In or around June 2015, Hurd and Brandon Kujawski, Carter Lumber's Charlotte Market Regional Vice President, began discussing Hurd's potential

employment with Carter Lumber. (ECF No. 25.12 at ¶ 8.) On July 6, 2015 Hurd sent Kujawski an email seeking a position with Carter Lumber. (ECF No. 25.20 at pp. 64–65.)

11. In his discussions with Carter Lumber, Hurd claimed he had good relationships with Plaintiff's Sales Representatives. Prior to becoming employed with Carter Lumber, Hurd recruited Plaintiff's Sales Representatives Tommy Ashley ("Ashley"), Jeffrey Jones ("Jones"), Tyler Barnes ("Barnes"), Casey Crouch ("Crouch"), and Ken Avery ("Avery") to leave Plaintiff for Carter Lumber.[2] Ashley, Jones, Crouch, and Avery comprised four of Plaintiff's top five salespersons, and Ashley, Jones, and Barnes were Plaintiff's entire Rock Hill outside sales staff. (Philip Dep., ECF No. 35, Ex. 41 at 14–15.) Kujawski and Hurd met with Ashley, Jones, Barnes and Crouch. (Kujawski Dep., ECF No. 35, Ex. 39 at pp. 85–88.) Avery was not interested in going to work for Carter Lumber. (Avery Dep., ECF No. 25.13 at pp. 14–15.) Ashley and Jones negotiated increases in the offers from Carter Lumber. (Ashley Dep., ECF No. 25.19 at p. 59; Ashley Offer Letter, ECF No. 35, Ex. 1; Jones Dep., ECF No. 25.11 at pp. 38–39.)

12. Plaintiff was aware of Carter Lumber's attempts to recruit its Sales Representatives and offered some of them increased compensation to remain with Plaintiff. (ECF No. 36, Ex. A at ¶ 50.)

---

[2] It is undisputed that Carter Lumber also recruited, successfully and unsuccessfully, other of Plaintiff's Sales Representatives during 2015 and early 2016. For purposes of responding to the Motion, Plaintiff has focused its arguments on Ashley, Jones, Barnes, Crouch, and Avery. (Pls.' Resp. Opp. Mot. For SJ, ECF No. 38.1 at pp. 2, 6.)

13.     On August 25, 2015, Carter Lumber made offers of employment to Ashley, Jones, Barnes, and Crouch. (ECF No. 35, Ex. 11.) Carter Lumber offered Ashley, Jones, and Crouch substantially more than they were being paid by Plaintiff. Plaintiff alleges that the compensation offered was "significantly above the market rate and [ ] not sustainable on a long-term or permanent basis."(ECF No. 36, Ex. A at ¶ 38.)

14.     On August 26, 2015, Carter Lumber made an offer of employment to Hurd. (ECF No. 35, Ex. 2.) Carter Lumber offered Hurd a bonus of $5,000.00 for every new Sales Representative that Hurd recruited to Carter Lumber on or before December 31, 2016. (*Id.*) On August 31, 2015, Hurd began employment with Carter Lumber.

15.     On October 2, 2015, Ashley and Jones resigned from Plaintiff and began working for Carter Lumber. Barnes and Crouch rejected the offers from Carter Lumber and remained employed with Plaintiff.

16.     Prior to resigning from Plaintiff, Ashley downloaded his "TBC email folder" to a flash drive (the "Ashley Flash Drive"). (Ashley Dep., ECF No. 35, Ex. 31 at p. 73.) The email folder contained Plaintiff's price quotes, purchase orders, and emails regarding Plaintiff's customers. (Butler Aff., ECF No. 35, Ex. 45 at ¶ 6.) Ashley claims he did not thereafter access the Ashley Flash Drive. (Ashley Aff., ECF No. 25.17 at ¶ 10.)

17.     Prior to resigning from Plaintiff, Jones hand wrote a list of phone numbers and email addresses of customers he had serviced (the "Jones Customer

List") for his use at Carter Lumber. (Jones Dep., ECF No. 35, Ex. 38 at p. 51.) Jones used the Jones Customer List to contact the customers after he began work with Carter Lumber. (*Id.*)

18. It is undisputed that after going to work for Carter Lumber, Ashley and Jones successfully solicited a number of Plaintiff's customers to do business with Carter Lumber. Other than Jones' use of the Jones Customer List, there is no evidence in the record that Hurd, Ashley, or Jones used Plaintiff's information to solicit those customers.

D. *Carter Lumber's alleged scheme to raid Plaintiff's Sales Representatives and steal trade secrets*

19. Plaintiff alleges that Carter Lumber hired Hurd to recruit Plaintiff's Sales Representatives as part of a plan by Carter Lumber to steal Plaintiff's best employees and trade secrets. In the Second Amended Verified Complaint, Plaintiff alleges as follows:

> 26. Upon information and belief, Carter Lumber did not hire Mr. Hurd to utilize any sales experience or expertise he may have in the building materials industry generally; rather, Carter Lumber hired Mr. Hurd specifically to exploit the misappropriated Trade Secrets and his detailed knowledge of and relationships with certain TBC salespersons and employees to target such salespersons and employees and lure them to Carter Lumber.
>
> …
>
> 28. Upon information and belief, Carter Lumber, through Mr. Hurd, intended to pirate TBC's most critical employees, including most, if not all, of its sales staff for the purpose of misappropriating TBC's Trade Secrets, confidential information and goodwill which were entrusted to such salespersons.

29. Upon information and belief, by pilfering TBC's employees and Trade Secrets, confidential information and goodwill entrusted to and possessed by such salespersons and employees, Carter Lumber intended to carry out a plan, spearheaded by Mr. Hurd, to acquire TBC's most important customers for the dual purpose of crippling TBC's ability to compete and immediately establishing Carter Lumber as a competitive building materials supplier in the Carolinas (the "Plan").

(ECF No. 36, Ex. A at ¶¶ 26, 28–29.)

20. In support of its allegation that Carter Lumber intended to steal its top employees, Plaintiff points to the deposition testimony of Robert Rose ("Rose"), a former Carter Lumber General Manager. Rose testified that during a telephone conference in December 2013 with Kip Gleckler, Carter Lumber's Senior Vice President of Field Operations, Gleckler said that Carter Lumber should "go buy these businesses without buying these businesses and take as many [employees] as we can." (Rose Dep., ECF No. 35, Ex. 42 at pp. 35–37.) Rose testified that Gleckler's statement referred to Plaintiff, but admitted Gleckler also discussed hiring employees away from 84 Lumber during the same phone call. (*Id.*) Rose also conceded that Gleckler regularly discussed trying to hire competitors' employees in an effort to grow Carter Lumber's business in the Charlotte area. (*Id.* at pp. 37—38.)

21. Plaintiff has also provided testimony from Sales Representative Buddy Ashley, who stated that he met with Gleckler after Plaintiff had filed this lawsuit in March 2016 to discuss potential employment with Carter Lumber. Buddy Ashley testified that Gleckler was "very upset" about the lawsuit, and stated "I want to hurt [Skip Norris] . . . I'm going to take whoever I can take to hurt him." (B. Ashley Dep., ECF No. 35, Ex. 30 at pp. 103—05.)

22. The evidence in the record does not support Plaintiff's allegation that Sales Representatives possessed knowledge of Plaintiff's trade secrets. Some of Plaintiff's Sales Representatives testified that they considered little, if any, of the information they used to be confidential, and others testified they do not use confidential information at all. (Barnes Dep., ECF No. 25.7 at p. 14; ECF No. 25.13 at pp 18—19; Jones Aff., ECF No. 25.16 at ¶¶ 4—5; ECF No. 25.17 at ¶¶ 4—5.) Plaintiff's Sales Representatives deposed in this case could not recall ever receiving any training or education on confidential information. (B. Ashley Dep., ECF No. 25.4 at pp. 29—30; Crouch Dep., ECF No. 25.5 at p. 48; ECF No. 25.7 at p. 14; Holman Dep., ECF No. 25.9 at p. 67; ECF No. 25.13 at pp. 19.)

23. In addition, while some Sales Representatives testified that customer price quotes are "confidential," there is no evidence that Hurd, Ashley, or Jones used or disclosed Plaintiff's pricing information. It is undisputed that Plaintiff's customers regularly share the prices they are quoted by LBM suppliers in the hope of securing better pricing. (Norris Dep., ECF No. 25.1 at pp. 53—54; ECF No. 25.7 at pp. 15—17; ECF No. 25.9 at p. 49.) Plaintiff encourages its Sales Representatives to obtain competitors' quotes so they may be shared with other TBC employees. (ECF No. 25.1 at pp. 141—48.)

E. *The Complaint and proceedings in the case*

24. On March 3, 2016, Plaintiff filed a Complaint in Mecklenburg County Superior Court. (ECF No. 1.)

25.     On March 18, 2016, this case was designated a mandatory complex business case by Order of the Chief Justice of the North Carolina Supreme Court, and assigned to the undersigned Special Superior Court Judge for Complex Business Cases by Order of Chief Judge James L. Gale on March 23, 2016. (ECF Nos. 3 and 4.)

26.     On April 7, 2016, Plaintiff filed an Amended and Verified Complaint. (Am. and Verified Compl, ECF No. 5.) The Amended and Verified Complaint made claims against Carter Lumber and Hurd for violation of the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152 et. seq. ("TSPA") (Count One) (hereinafter, references to the North Carolina General Statutes will be to "G.S."), tortious interference with contract (Count Two), tortious interference with prospective economic advantage (Count Three), and, against Carter Lumber for violation of the North Carolina Unfair and Deceptive Trade Practices Act, G.S. § 75-1.1 ("UDTP") (Count Four). The Amended and Verified Complaint also sought injunctive relief, but Plaintiff never pursued an injunction.

27.     On April 18, 2016, Defendants filed a Motion to Dismiss Plaintiff's claims. (Mot. to Dismiss, ECF No. 6.) The Motion to Dismiss was briefed by the parties and arguments were heard by the Court.  On October 21, 2016, the Court issued its Opinion and Order on the Motion to Dismiss. (Op. and Order on Mot. to Dismiss, ECF No. 19.) In its Opinion and Order, the Court dismissed Plaintiff's claim for tortious interference with prospective economic advantage, but denied the Motion with regard to Plaintiff's other claims.

28. On March 20, 2017, Defendants filed the Motion seeking summary judgment as to Plaintiff's remaining claims. (Mot. For SJ, ECF No. 25.10.)

29. On April 24, 2017, Plaintiff filed a Motion for Leave to Amend and Substitute Parties ("Motion to Amend") on the grounds that Carter Lumber–NC and Carter Lumber–SC, and not Carter Lumber, Inc., are the proper Defendants in this action. (Pl. Mot. to Amend and Sub. Parties, ECF No. 36.) Plaintiff attached a proposed Second Amended and Verified Complaint to the Motion to Amend. (ECF No. 36, Ex. A.) The Second Amended and Verified Complaint addresses the proper Carter Lumber defendants, but differs in no other substantive way from the Amended and Verified Complaint.

30. On May 31, 2017, the Court heard oral arguments concerning the Motion to Amend, and the Court orally granted the Motion to Amend.

31. On June 6, 2017, the Court filed its Order on Plaintiff's Motion for Leave to Amend and Substitute Parties commemorating its oral ruling made at the May 31 hearing. (Order, ECF No. 43.) Pursuant to the Order, the Second Amended Complaint was considered filed on June 6, 2017.

32. Defendants' Motion for Summary Judgment is now ripe for determination.

<u>ANALYSIS</u>

33. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that any party is entitled to

judgment as matter of law." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012). An issue is "material" if "resolution of the issue is so essential that the party against whom it is resolved may not prevail." *McNair v. Boyette*, 282 N.C. 230, 235, 192 S.E.2d 457, 460 (1972). The moving party bears "the burden of clearly establishing lack of a triable issue to the trial court." *N.C. Farm Bureau Mut. Ins. Co. v. Sadler*, 365 N.C. 178, 182, 711 S.E.2d 114, 116 (2011) (quotation marks omitted). The moving party may meet this burden by "proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would have been barred by an affirmative defense." *Variety Wholesalers, Inc.*, 365 N.C. at 523, 723 S.E.2d at 747. All evidence is viewed in the light most favorable to the nonmoving party with the benefit of all reasonable inferences. *Bruce-Terminix Co. v. Zurich Ins. Co.*, 130 N.C. App. 729, 733, 504 S.E.2d 574, 577 (1998).

34. As recently reiterated by the North Carolina Court of Appeals, the burden on the non-movant goes beyond merely producing some evidence or a scintilla of evidence in support of its claims. Rather,

> [i]f the movant meets [its] burden, the nonmovant must take affirmative steps to set forth specific facts showing the existence of a genuine issue of material fact. An adverse party may not rest upon the mere allegations or denials of his pleading. A genuine issue of material fact is one that can be maintained by substantial evidence. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference.

*Khashman v. Khashman*, 2017 N.C. App. LEXIS 715, *15 (Sept. 5, 2017) (citations and quotation marks omitted).

A.     *Evidentiary Issues*

35.     Before considering the Motion, the Court must address Defendants' challenge to certain evidence submitted by Plaintiff in opposition to the Motion.

36.     Defendants argue that Plaintiff's Exhibits 5, 18–20, and 25–28 are not authenticated and therefore inadmissible. (Reply to Pl. Response in Opp. To SJ, ECF No. 39 at pp. 2–4.) The exhibits consist of emails, Plaintiff's and Carter Lumber's sales and compensation data, and the Hurd Customer List. Defendants point out that these exhibits have not been submitted with affidavits or deposition testimony identifying them. It is apparent, however, from the identifying bates numbers on the documents that they were produced by the two parties during discovery. Defendants do not dispute that the documents are what Plaintiff claims them to be, or that the documents have been changed of altered in any way. The Court concludes, in its discretion, that Plaintiff's Exhibits 5, 18–20, and 25–28 are properly considered by the Court as part of the record on the Motion.

37.     Defendants also contend the affidavit of Clark Walton submitted by Plaintiff must be excluded in the Court's analysis of the Motion. (ECF No. 39, at pp. 5–7.). Walton is an expert in computer forensics. At the hearing on the Motion, Plaintiff's counsel admitted that Plaintiff failed to identify Walton as an expert witness by the deadline in the CMO. The Court, in its discretion, will exclude Walton's affidavit and will not consider it in deciding the Motion.

38.     Defendants also ask the Court to refrain from considering the affidavit of William M. Butler, one of Plaintiff's attorneys. (ECF No. 39, at pp. 7–9.) Defendants ask the Court to exclude Butler's affidavit from consideration because he purports to identify Plaintiff's documents and information contained on the Ashley Flash Drive but does not have personal knowledge of Plaintiff's internal documents and cannot competently testify as to anything other than Defendants' physical production of the flash drive itself. (*Id.*) Defendants do not dispute that Plaintiff's information was contained on the Ashley Flash Drive, nor do they claim that Butler has not accurately summarized the contents of the Ashley Flash Drive. The Court concludes, in its discretion, that Butler's affidavit is properly considered by the Court as part of the record on the Motion.

39.     The Court will now address the Motion as to each of Plaintiff's claims.

B.     *Misappropriation of Trade Secrets*

40.     Plaintiff contends that Defendants misappropriated Plaintiff's trade secrets when Hurd, Ashley, and Jones "admittedly took TBC's confidential and proprietary information just prior to their resignations." (ECF No. 38.1, at p. 12.)

41.     The TSPA defines a "Trade Secret" as:

> [B]usiness or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

G.S. § 66-152(3).

42.     In North Carolina, courts consider the following factors in determining whether information constitutes a trade secret:

> (1) The extent to which [the] information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; (4) the value of information to business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Wilmington Star-News, Inc. v. New Hanover Reg'l Med. Ctr., Inc.*, 125 N.C. App. 174, 180–81, 480 S.E.2d 53, 56 (1997).

43.     The TSPA defines "misappropriation" as the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." G.S. § 66-152(1). One establishes a *prima facie* case of misappropriation by showing that the opposing party "(1) [k]nows or should have known of the trade secret; and (2) [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." *GE Betz, Inc. v. Conrad*, 231 N.C. App. 214, 233, 752 S.E.2d 634, 649 (2013) (quoting G.S. § 66-155).

i.    Hurd and Jones Customer Lists

44.    Plaintiff has not established that the Hurd Customer List or the Jones Customer list are trade secrets. To survive a motion for summary judgment, Plaintiff "must allege facts that would allow a reasonable finder of fact to conclude that the information [at issue] was not 'generally known or readily ascertainable.'" *Area Landscaping, L.L.C. v. Glaxo-Wellcome, Inc.*, 160 N.C. App. 520, 525, 586 S.E.2d 507, 511 (2003) (quoting *Bank Travel Bank v. McCoy*, 802 F. Supp. 1358, 1360 (E.D.N.C. 1992). The Hurd Customer List and the Jones Customer Lists consist of *only* the names, phone numbers, and email addresses of customers. Plaintiff has not shown that there is anything in the lists that is remotely proprietary, such as pricing, margins, or marketing strategies. Although customer lists, when compiled with pricing and bidding formulas, can sometimes qualify as a trade secret under the TSPA, the Court does not consider a customer list containing only information that is easily accessible through a telephone book or other readily available sources to be a trade secret. *See, e.g., Novacare Orthotics & Prosthetic E., Inc. v. Speelman*, 137 N.C. App. 471, 478, 528 S.E.2d 918, 922 (2000) ("Indeed, any information used to contact the clients would have been easily accessible to defendant through a local telephone book."); *Kadis v. Britt*, 224 N.C. 154, 162, 29 S.E.2d 543, 547–548 (1944) (holding that an employee's remembered knowledge of the names and addresses of his employer's customers, gained during the performance of the employer's duties, is not a trade secret.). Accordingly, the Court concludes that the Hurd Customer List

and the Jones Customer List do not constitute protectable trade secrets under the TSPA in the circumstances presented here.

ii. Hurd's knowledge of Sales Representatives

45. Plaintiff's contention that Hurd misappropriated trade secrets he learned through his daily interaction with Plaintiff's salespeople and through his knowledge of which salespeople serviced the most profitable customers is contrary to controlling North Carolina law. In North Carolina, customer information maintained in the memory of a departing employee is not a trade secret. *See, e.g., Kadis*, 224 N.C. at 162, 20 S.E.2d at 547–548 ("By the majority view, the knowledge of a deliveryman, or other personal solicitor, of the names and addresses of his employer's customers, gained during the performance of his duties, is not a trade secret, partly because the information would be readily discoverable, and partly because of the court's reluctance to deprive the employee of his subjective knowledge acquired in the course of employment."); *Asheboro Paper & Packaging, Inc. v. Dickinson*, 599 F. Supp. 2d 664, 677 (M.D.N.C. 2009) ("Under North Carolina law, customer information maintained in the memory of a departing employee is not a trade secret.").

46. Plaintiff argues "there is evidence that Defendants' [*sic*] used Hurd's knowledge of TBC's customer-related data gained as TBC's sales manager, such as detailing customer-specific financing terms for customers retained by Jones." (ECF No. 38.1, at p. 19; ECF No. 35, at Exs. 5 and 7 (SEALED).) The information referenced by Plaintiff, however, is nothing more than Hurd's confirmation that Jones, while working for Plaintiff, provided certain customers 60 days in which to pay invoices

instead of the standard 30 days. In addition, Plaintiff produced no evidence that Hurd obtained this information through anything other than his memory of the payment terms of his previous employment. Again, information retained in a former employee's memory is not a trade secret. *Kadis*, 224 N.C. at 162, 20 S.E.2d at 547–548.

    iii.    <u>Plaintiff's sales and pricing information</u>

47.    Finally, Plaintiff alleges that Hurd learned trade secrets through his access to Plaintiff's sales and reporting system including, *inter alia*, customer purchasing patterns, customer-specific pricing, and marketing strategies. Plaintiff, however, has not shown that Hurd misappropriated such information. A *prima facie* case of misappropriation requires substantial evidence that the defendant: "(1) [k]nows or should have known of the trade secret; and (2) [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it *without the express or implied consent or authority of the owner.*" G.S. § 66-155 (emphasis added). This Court recently has held that:

> Evidence that a former employee had access to, and therefore an "opportunity to acquire," an employer's trade secrets, without more, is not sufficient to establish a prima facie case of misappropriation. Rather, the employer must establish either that the former employee accessed its trade secrets *without authorization* or provide other sufficient evidence of misappropriation to raise an inference of actual acquisition or use of its trade secrets.

*Am. Air Filter Co. v. Price*, 2017 NCBC LEXIS 9, *22 (N.C. Super. Ct. Feb. 3, 2017) (emphasis added).

48. Plaintiff has failed to produce "substantial evidence" of Defendants actual acquisition or use of its trade secrets. While Hurd's employment with Plaintiff gave him an "opportunity to acquire" the information contained in Plaintiff's sales systems, Hurd's access was *authorized*. Plaintiff has produced no evidence giving rise to an inference that Hurd has used Plaintiff's trade secrets in any unauthorized or improper way. *See, e.g., Id.*; *Addison Whitney, LLC v. Cashion*, 2017 NCBC LEXIS 23, \*18 (N.C. Super. Ct. Mar. 15, 2017) ("[A] wrongdoer's access to and opportunity to acquire a trade secret—without more—is insufficient [to establish a prima facie case of misappropriation]. Rather, there must be *substantial evidence* (1) that the wrongdoer accessed the trade secret without consent, or (2) of misappropriation resulting in an inference of actual acquisition or use of the trade secret.") (emphasis in original) (citation omitted). Plaintiff produced no evidence that Hurd disclosed or used any information in his employment with Carter Lumber that he learned through his authorized access to Plaintiff's sales reporting systems, nor did Plaintiff provide any other evidence of misappropriation.

iv.   The Ashley Flash Drive

49. It is undisputed that the Ashley Flash Drive contained some customer-specific information including quotes, purchase orders, and emails regarding Plaintiff's customers. (ECF No. 35, at Ex. 45 ¶ 6; ECF No. 35, at Ex. 17 (SEALED).) Plaintiff presents no evidence regarding the contents of the purchase orders or emails on the Ashley Flash Drive. Plaintiff has, however, filed as exhibits with the Court copies of three price quotes apparently provided to Plaintiff's customers that were on

the Ashley Flash Drive. (ECF No. 35, at Ex. 17 (SEALED).) The price quotes are dated in March and September of 2015, are on form documents addressed to the customer, and apparently show the price quoted by Plaintiff for particular products or jobs. (*Id.*) The documents are not marked as confidential and do not contain any language requesting that the client keep the quote confidential. (*Id.*) As discussed *infra*, customers of LBM suppliers regularly disclose to the suppliers the prices charged by their competitors, and Plaintiff does not explain how a price quote, once provided to the customer, could be considered a trade secret.

50.     The Court concludes that the price quotes at issue here, by themselves, are not trade secrets within the meaning of the TSPA. G.S. § 66-152(3). In fact, information regarding pricing in the LBM industry, when presented by itself and not as part of a compilation with other proprietary or confidential information, would not seem to fall under the definition of "trade secret" in the TSPA. *Id.*

51.     Finally, there is no competent evidence in the record that Ashley ever accessed the Ashley Flash Drive after ending his employment with Plaintiff, nor that Carter Lumber ever used any of the information on the Ashley Flash Drive.

52.     Plaintiff has not produced evidence sufficient to raise a genuine issue of material fact regarding Plaintiff's claim for trade secret misappropriation, and so Defendants' Motion regarding Plaintiff's TSPA claim should be GRANTED.

C.  *Tortious Interference with Contract*

53.     Plaintiff alleges that Defendants tortiously interfered with its employment contracts with Ashley and Jones. (ECF No. 36, at Ex A ¶¶ 70–76.)

Plaintiff did not have written covenants not-to-compete with Ashley and Jones, but an at-will employment contract can be the basis for claim of tortious interference. *See, e.g., Smith v. Ford Motor Co.*, 289 N.C. 71, 85, 221 S.E.2d 282, 291 (1976); *Childress v. Abeles*, 240 N.C. 667, 678, 84 S.E.2d 176, 184 (1954) ("The fact that the employment is at the will of the parties, respectively, does not make it one at the will of others . . . by the weight of authority the unjustified interference of third persons is actionable although the employment is at will.").

54.     In order to prevail on a claim for tortious interference with contract, a plaintiff must establish that: (1) a valid contract existed between the plaintiff and a third party that conferred upon plaintiff contractual rights against the third party; (2) the defendant was aware of the contract; (3) the defendant intentionally induced the third party not to comply with the contract; (4) the defendant did so *without justification* and (5) actual injury to plaintiff resulted. *United Labs v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988) (emphasis added).

55.     It is undisputed that Plaintiff had valid at-will employment contracts with Ashley and Jones, that Defendants were aware that Ashley and Jones were employed by Plaintiff, and that Defendants induced Ashley and Jones to terminate employment with Plaintiff and become employed with Carter Lumber. The Court also concludes that the record evidence is sufficient to create an issue of fact as to whether Plaintiff's business was negatively impacted by Ashley's and Jones' resignations. (ECF No. 35, at Ex. 41 pp. 57—58.)

56.     Plaintiff has not, however, established that Defendants acted *without justification* in hiring Ashley and Jones. The North Carolina Supreme Court has long recognized that if the defendant's interference with an at-will employment relationship is "for a legitimate business purpose, his actions are privileged. … "competition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful." *Peoples Sec. Life Ins. Co. v. Hooks,* 322 N.C. 216, 221, 367 S.E.2d 647, 650 (1988).

57.     The privilege to interfere with an at-will contract, however, "is conditional or qualified; that is, it is lost if exercised for a wrong purpose. In general, a wrong purpose exists where the act is done other than as a reasonable and *bona fide* attempt to protect the interest of the defendant which is involved." *Id.* at 220, 367 S.E.2d at 650; *see also Kuykendall,* 322 N.C. at 662, 370 S.E.2d at 387 ("We concluded [in *Hooks*] that the fact that the plaintiff and defendant were in competition was sufficient to justify the defendant 'in offering the plaintiff's employees new jobs and locating them in their previously assigned territory.' . . . however, we also emphasized that '[t]he privilege [to interfere] is conditional or qualified; that is it is lost if exercised for a wrong purpose.'"). Accordingly, "[i]f the defendant's only motive is a malicious wish to injure the plaintiff, his actions are not justified." *Hooks*, 322 N.C. at 221, 367 S.E.2d at 650); *see also Area Landscaping, L.L.C.*, 160 N.C. App. at 523, 586 S.E.2d at 510 ("In order to demonstrate the element

of acting without justification, the action must indicate no motive for interference other than malice.").

58.     The malice required to overcome a justification of business competition is legal malice, and not actual malice. *Childress*, 240 N.C. at 675, 84 S.E.2d at 182 ("It is not necessary, however, to allege and prove actual malice in the sense of personal hatred, ill will, or spite in order to make out a case for the recovery of compensatory damages against the outsider for tortiously inducing the breach of the third person's contract with the plaintiff. The term 'malice' is used in this connection in its legal sense, and denotes the intentional doing of the harmful act without legal justification."). Legal malice "means intentionally doing a wrongful act or exceeding one's legal right or authority in order to prevent the making of a contract between two parties" and the act "must be taken with the design of injuring one of the parties to the contract or of gaining some advantage at the expense of a party" *Murphy v. McIntyre*, 69 N.C. App. 323, 328–29, 317 S.E.2d 397, 401 (1984).

59.     The record evidence fails to create an issue of material fact as to whether Defendants acted without justification. First, Plaintiff concedes that Carter Lumber was a competitor motivated by desire to increase its business in the Charlotte and Rock Hill markets. (ECF No. 36, at Ex. A ¶ 10.) It is undisputed that Carter Lumber sought to do so by selectively hiring salesmen away from its competitors. The Court concludes that the undisputed facts establish that Carter Lumber had a legitimate business reason for recruiting and hiring Ashley and Jones away from Plaintiff. *See Griffin v. Holden*, 180 N.C. App. 129, 140, 636 S.E.2d 298, 306 (2006)

("Even if plaintiff shows that defendant acted with ill intentions, legal malice does not exist unless plaintiff can show that defendant had no legitimate business justification for the interference.").

60. Second, Plaintiff's evidence does not support the contention that Carter Lumber acted with legal malice. There is no evidence that Carter Lumber exceeded its legal rights by hiring Ashley and Jones. Gleckler's statements regarding "buying the business without buying the business" by hiring competitor's best Sales Representatives is merely a clever summary of Carter Lumber's legitimate business expansion strategy. The statement does not support the conclusion that Carter Lumber's sole motivation was to injure Plaintiff. In fact, the evidence establishes that Gleckler applied the same strategy against other Carter Lumber competitors in the market.

61. Gleckler's statement that he wanted to hurt Norris and "take whoever I can take to hurt him" also does not support Plaintiff's contention that Defendants acted with legal malice. The statement was made four to five months after Carter Lumber hired Ashley and Jones, and was made in response to Plaintiff's filing of this lawsuit. While the statement may reflect Gleckler's personal ill-will towards Norris and Plaintiff, and could (at best) be used as support for a claim of actual malice, it does not support a claim of legal malice.

62. Similarly, the record evidence supports the conclusion that the offers for temporary above-market compensation that Carter Lumber offered to Plaintiff's Sales Representatives were the product of negotiations between Carter Lumber and

the Sales Representatives, and reflected the compensation necessary to convince the Sales Representatives to leave Plaintiff's employment. Carter Lumber explained that it was willing to initially overpay Plaintiff's employees as an investment in the future success of Carter Lumber in the Charlotte metro market. (ECF No. 35, at Ex. 39 pp. 82–83, 96–98.)

63. Since there is no issue of material fact as to Defendants' justification for recruiting and hiring Ashley and Jones, Plaintiff's claim for tortious interference with contract should be GRANTED.

### D. *Unfair and Deceptive Trade Practices*

64. Plaintiff alleges that Carter Lumber violated the UDTPA through their "coordinated and targeted pirating of [Plaintiff's Sales Representatives] and other TBC employees, improper interfering [*sic*] with TBC's customer relationships, retaining [*sic*], disclosing [*sic*] and use of Trade Secrets and confidential business information of TBC." (ECF No. 36, at Ex. A ¶ 86.)

65. G.S. § 75-1.1 declares unlawful any "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." To state a claim under G.S. § 75-1.1, a plaintiff must allege "(1) [that] the defendants committed an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff[] or to the plaintiffs' business." *Birtha v. Stonemor, N.C., LLC*, 220 N.C. App. 286, 298, 727 S.E.2d 1, 10 (2012). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical,

oppressive, unscrupulous, or substantially injurious to consumers, and a practice is deceptive if it has the capacity or tendency to deceive." *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 91, 747 S.E.2d 220, 228 (2013) (quotation marks omitted). "An act or practice is deceptive if it has the capacity or tendency to deceive." *Ace Chem. Corp. v. DSI Transps.*, 115 N.C. App. 237, 247, 446 S.E.2d 100, 106 (1994) (quotation marks omitted). Unfair competition eludes a precise definition, and whether an act or practice is unfair or deceptive is ultimately a question of law for the Court. *Songwooyarn Trading Co. v. Sox Eleven, Inc.*, 213 N.C. App. 49, 56, 714 S.E.2d 162, 167 (2011).

66. Having already determined that Plaintiff has failed to come forward with sufficient evidence to support its claim that Carter Lumber misappropriated Plaintiff's trade secrets, Plaintiff's UDTPA claim, to the extent it is based on trade secret misappropriation, must also fail. *See Area Landscaping, L.L.C.*, 160 N.C. App. at 526, 586 S.E.2d at 512 (holding that plaintiff's UDTPA claim based solely on defendants' alleged misappropriation of trade secrets must fail when summary judgment is granted on the misappropriation claim).

67. In addition, the Court previously dismissed Plaintiff's claim for Defendants' interference with Plaintiff's customer relationships, and thus that conduct cannot be the basis for a claim for unfair trade practices. (ECF No. 19.)

68. Plaintiff is also mistaken in its argument that Carter Lumber's solicitation, and ultimate "pirating," of certain employees, and Carter Lumber's interference with Plaintiff's customer relationships is "unfair" or "deceptive." It is

undisputed that Plaintiff was aware of Carter Lumber's attempts to solicit its Sales Representatives. It also is undisputed that Plaintiff offered increased compensation to some of the solicited employees in an attempt to convince them to remain with Plaintiff rather than leave for Carter Lumber. (ECF No. 50, at Ex. A ¶ 50.) Plaintiff has produced no evidence that Carter Lumber's solicitation of Plaintiff's Sales Representatives was deceptive or misleading. *Chastain v. Wall*, 78 N.C. App. 350, 337 S.E.2d 150 (1985) ("In order to succeed under G.S. 75-1.1…plaintiff must…show that the acts complained of possessed the tendency or capacity to mislead, or created the likelihood of deception.") (quotation marks omitted).

69. To the extent that Plaintiff claims Carter Lumber's actions were unfair, the Court finds there is no genuine issue of fact that Carter Lumber's solicitation of Plaintiff's Sales Representatives offended established public policy, or was "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Bumpers*, 367 N.C. at 91, 747 S.E.2d at 228. Carter Lumber was Plaintiff's competitor, had a business interest in increasing its market share in the Charlotte-metro area, and recruited Plaintiff's at-will Sales Representatives, as well as other competitors' Sales Representatives, as a means of doing so. This type of conduct, particularly in the competitive LBM business, does not rise to the level of a violation of the UDTPA. Defendants' Motion regarding Plaintiff's UDTPA claim should be GRANTED.

THEREFORE, IT IS ORDERED that Defendants' Motion for Summary Judgment as to all of Plaintiff's remaining claims is GRANTED.

This the 21st day of September, 2017.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge for
Complex Business Cases